IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| **ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON,**<br><br>Plaintiffs,<br><br>v.<br><br>**APPLE INC.,**<br><br>Defendant. | Civil Action No.  2:21-cv-376 |

## ORIGINAL COMPLAINT

Plaintiffs Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively "Ericsson") file this Original Complaint against Apple Inc. ("Apple") and hereby allege as follows:

### NATURE OF ACTION

1. This is a case in which Ericsson seeks a declaration that it has complied with its contractual commitment to the European Telecommunications Standards Institute (ETSI) that it is prepared to grant licenses to its essential patents on terms that are fair, reasonable, and non-discriminatory (FRAND). Ericsson has been negotiating with Apple towards a license under Ericsson's cellular essential patents. Apple has publicly accused Ericsson's licensing practices as violating FRAND, and nothing in Apple's negotiation conduct shows that it no longer disputes that Ericsson is prepared to grant Apple a license on FRAND terms and conditions and that Ericsson has otherwise complied with the ETSI Intellectual Property Rights Policy. A declaration from this Court will resolve the dispute between the parties.

2. For more than four decades, Ericsson has pioneered the development of the modern cellular network. Ericsson develops and sells infrastructure equipment that makes up the backbone of modern networks; that is, the base stations and cell tower equipment that mobile phones

1

communicate with. Major mobile network operators all over the world buy equipment and/or services from Ericsson. Ericsson manages networks that serve more than one billion subscribers globally, and Ericsson's equipment is found in more than one hundred and eighty countries.

3. Ericsson is widely viewed as one of the leading innovators in the field of cellular communications. Due to the work of more than twenty-five thousand Ericsson research and development employees, Ericsson's inventions are a valuable part of the fundamental technology used in phones and cellular networks worldwide, providing improved performance and new features for the benefit of consumers.

4. As a result of its extensive research and development efforts, Ericsson has been awarded more than fifty-seven thousand patents worldwide. Many of Ericsson's patents are essential to the telecommunications standards ("Cellular Standards"), including 2G (GSM, GPRS, and EDGE), 3G (UMTS/WCDMA and HSPA), 4G (LTE, LTE-Advanced, and LTE-Advanced Pro) and 5G (NR, New Radio), which are used by Apple's products.

5. For decades, Ericsson has voluntarily contributed its cellular inventions to develop and improve the Cellular Standards. Ericsson has also voluntarily and publicly committed to ETSI that it is prepared to grant licenses under its portfolio of patents essential to the Cellular Standards ("Essential Patents") on fair, reasonable, and non-discriminatory terms.

6. Consistent with its FRAND commitment, Ericsson has widely licensed its portfolio of Essential Patents in over one hundred agreements with members of the telecommunications industry who have agreed to pay royalties to Ericsson for a global portfolio license. Ericsson reinvests much of the licensing revenue it receives under these global agreements into inventing future generations of standardized telecommunication technologies, spending nearly five billion dollars annually on research and development.

7. Apple is the largest smartphone manufacturer in the United States and requires a license to Ericsson's Essential Patents. Apple first licensed Ericsson's 2G and 3G Essential Patents in 2008 when it released the first iPhone. In 2015, Apple and Ericsson executed another global cross-license, covering both parties' patents related to the 2G, 3G, and 4G cellular standards.

8. Despite receiving substantial revenues from its sales of iPhones and other cellular devices, Apple has historically resisted licensing overtures by Ericsson, and other essential patent holders, as part of a global strategy to devalue standard essential patents and reduce Apple's royalty payments. As part of its strategy, Apple has accused essential patent holders of "hold up," which Apple characterizes as essential patent holders concealing their licensing terms from the industry until the standard is frozen, then using that "lock in" to obtain supra-FRAND royalty rates from the industry.

9. For years, Apple has been highly vocal in its public attacks against the essential patent licensing practices of Ericsson and other patent owners. Apple has asserted that licensing practices violate FRAND if they are not in accord with Apple's self-proclaimed and highly publicized FRAND licensing principles (many of which have been expressly rejected by courts and by the industry). Apple has also publicly committed to not accept licensing offers that deviate from Apple's self-proclaimed principles.

10. In 2019, Apple announced its "core FRAND principles" on its website. Apple's core principles include: requiring that patent owners prove (to Apple's satisfaction) every patent to be licensed worldwide is actually essential, infringed, valid, and enforceable before Apple will take a license; requiring royalties be calculated on the now-rejected SSPPU theory; asserting that basing royalties on the value of patented inventions to the end user is *per se* discriminatory; and that licensing the fully conforming, end-user device is also discriminatory.

11. In sum, even before the first licensing meeting between Apple and Ericsson, Apple had already publicly proclaimed Ericsson's licensing program as discriminatory, Ericsson's rates as violating FRAND, and had publicly committed that Apple would only license essential patents on its own, self-proclaimed terms and conditions intended to devalue essential patents.

12. Apple has publicly disputed whether Ericsson is prepared to grant licenses on FRAND terms to its Essential Patents.

13. Apple's public attacks against Ericsson were not generalized criticisms, but rather, were made after Ericsson publicly announced its *ex ante* 5G/NR multimode royalty rates. On March 7, 2017, to provide transparency and predictability, Ericsson publicly announced its 5G/NR royalty rates upon which it was prepared to grant licenses to the industry. Ericsson made its rate announcement long before the Third Generation Partnership Project (3GPP) finalized its December 2017 non-standalone 5G standard and its June 2018 standalone 5G standard. In its announcement, Ericsson stated that it was prepared to grant licenses, subject to reciprocity, "at a fair and reasonable royalty rate of $5 per 5G/NR multimode compliant handset," and in certain circumstances for low priced handsets, "a floor of $2.5 per 5G/NR multimode compliant handset."

14. Apple was aware of Ericsson's March 2017 announcement of its 5G royalty rates.

15. Apple has accepted the 5G non-standalone and standalone standards knowing the standards included Ericsson's patented technology and knowing Ericsson had previously announced its 5G multimode royalty terms.

16. During the course of the parties' discussions, Apple has shown no inclination to retract, or even soften, its prior public statements that the licensing policies underlying Ericsson's *ex ante* 5G rates that apply to Apple phones violate FRAND. Nor has Apple retreated from its prior public assertions that the only way to comply with FRAND is to adhere to Apple's self-

declared methodology for licensing essential patents, despite court decisions that flatly rejected Apple's approach to cellular essential patent licensing.

17. Ericsson files this lawsuit to obtain a declaration that Ericsson is prepared to grant Apple a license on FRAND terms and conditions, that Ericsson's announced rate (which is available for Apple to accept) complies with its FRAND commitment, that Ericsson otherwise has fully complied with its FRAND commitment and all applicable laws in its negotiations with Apple, and that Ericsson has complied with all obligations imposed by standard-setting organizations, including 3GPP and ETSI. Apple's allegations of breach threaten Ericsson's reputation and business.

## PARTIES

18. Plaintiff Ericsson Inc. is a Delaware corporation with its principal place of business at 6300 Legacy Drive, Plano, Texas 75024. Ericsson Inc. is an affiliate of LME. Ericsson Inc. imports and sells cellular network infrastructure equipment to carriers in the United States. Ericsson Inc. is also responsible for participating in negotiations with Apple towards the patent license agreement at issue in this case.

19. Plaintiff Telefonaktiebolaget LM Ericsson ("LME") is a corporation organized under the laws of the Kingdom of Sweden with its principal place of business at Torshamnsgatan 21, Kista, 164 83, Stockholm, Sweden.

20. Defendant Apple is a California corporation, with its principal place of business at One Apple Park Way, Cupertino, California 95014. Apple also maintains a facility in Austin, Texas.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and/or 1332.

22. The amount in controversy exceeds $75,000.

23. Venue is proper in this judicial district under 28 U.S.C. § 1391.

24. This Court has both general and specific personal jurisdiction over Apple. Apple has continuous and systematic business contacts with the State of Texas. Apple's Texas ties run deep, and Apple is at home in Texas. Apple first opened an office in Texas in 1992 and has maintained a consistent presence in Texas—employing thousands over the past 25+ years. In 2018, Apple announced that it would develop a new $1 billion campus in Austin, employing up to 15,000 people, which is projected to be completed later this year or early 2022. Even before the 2018 expansion announcement, Austin was home to Apple's largest campus outside of Cupertino—employing over 6,000 people directly in 2016. Austin has served as Apple's second hub since at least 2016. Work done in Texas spans Apple's entire business, from chip design to finance, human resources, corporate sales, customer support, information systems, and accounting. Apple conducts its business throughout Texas by shipping, distributing, offering for sale, selling, and advertising (including the provision of an interactive web page) its products and/or services in the State of Texas.

25. Apple regularly does business or solicits business, engages in other persistent courses of conduct, and derives substantial revenue from products and/or services provided to individuals in Texas. Apple, directly and through subsidiaries or intermediaries (including distributors, retailers, and others), has purposefully and voluntarily placed one or more products and/or services in the stream of commerce related to this dispute with the intention and expectation that they will be purchased and used by consumers in Texas. Apple has directly negotiated with Ericsson's licensing executives located in Texas, purposely directing its negotiation communications to Ericsson executives in Texas.

**FACTUAL BACKGROUND**

A.  **Ericsson's Investment in Cellular Telecommunications and Resulting Patents**

26. Telefonaktiebolaget LM Ericsson was founded in 1876, and Ericsson Inc. is a wholly owned subsidiary of Telefonaktiebolaget LM Ericsson based in Plano, Texas. Ericsson supplies the cellular network infrastructure equipment used to build mobile networks across the world, serving more than one billion mobile subscribers in over 180 countries. In the United States, Ericsson's equipment is deployed by AT&T, Verizon, Sprint, T-Mobile, and other cellular networks.

27. Ericsson has a long history of innovation in the telecommunication industry and in the creation of the cellular standards. In addition to supplying equipment for 2G, 3G, 4G, and 5G networks, Ericsson was also well-known for its mobile phone business—ending in 2012 with the divestment of the popular "Sony Ericsson" brand. Years earlier, Ericsson coined the "smartphone" term when unveiling its GS88 handset in 1997, and it showcased an early version of a tablet with its Cordless Web Screen in 2000.

28. Ericsson has been at the forefront of every step of cellular standardization: Ericsson launched 2G phones on the first 2G network in 1991, Ericsson made the first 3G call in 2001, and Ericsson built the first 4G network in 2009. Ericsson continues to be at the forefront: Ericsson completed the first 5G trial system in Europe in 2016, and Ericsson's equipment has been deployed in 5G networks in the United States.

29. Ericsson prioritizes innovation and has invested $4-5 billion annually in research and development over the past decade. Ericsson's research and development activities include participating in the development of the 2G, 3G, 4G, and 5G cellular standards over the last 30+ years. Ericsson's engineers have attended hundreds of standardization meetings and made tens of thousands of technical contributions to the standards.

30. Ericsson protects its investments in research and development with intellectual property. Ericsson owns tens of thousands of patents related to wireless telecommunication technology, and Ericsson continues to develop and secure intellectual property as it innovates in this industry. Because Ericsson chooses to voluntarily contribute many of its cellular innovations to the standard-setting process—through technical contributions in standardization meetings—Ericsson has many patents essential to the cellular standards. Industry members attending the standardization meetings, including Apple, choose to adopt Ericsson's technology into the standard because Ericsson's technology is the best.

31. Ericsson has committed that it is prepared to grant licenses to any patents essential to the 2G, 3G, 4G, and 5G standards on fair, reasonable, and non-discriminatory (FRAND) terms and conditions, subject to reciprocity. Knowing Ericsson's commitment to FRAND licensing, other makers of cellular devices and network equipment, including Apple, continue to include Ericsson's technology in the 5G standard.

    **B.**     **ETSI, its IPR Policy, and the FRAND Commitment**

32. The European Telecommunications Standards Institute (ETSI) is an independent, non-profit standard development organization (SDO) that produces globally accepted standards for the telecommunication industry. ETSI has more than 900 members from more than 60 countries across five continents, including Ericsson and Apple. ETSI was responsible for the creation of the technical specifications for 2G (second generation, encompassing GSM, GPRS, as well as EDGE, which is frequently included within 2G but which is also referred to as 2.5G).

33. In 1998, ETSI and other SDOs founded and became organizational partners of the Third Generation Partnership Project (3GPP). 3GPP created the technical specifications for 3G (third generation, encompassing WCDMA/UMTS and HSPA), 4G (fourth generation,

encompassing LTE, LTE-Advanced, and LTE Advanced-Pro), and 5G (fifth generation, encompassing NR) mobile systems.

34. 3GPP working group meetings are attended by hundreds of engineers from dozens of companies involved in the cellular industry. These companies, including Ericsson, contribute their ideas and inventions for the improvement of the 3GPP technical specifications.

35. Frequently, ETSI members, including Ericsson, own patents essential to technical specifications promulgated by 3GPP. In this situation, a license is required from the patent owner for those wishing to implement the resulting standard.

36. ETSI has developed and promulgated an Intellectual Property Rights (IPR) Policy, the construction, validity, and performance of which is governed by French law. The ETSI IPR Policy is intended to strike a balance between the need for open standards on the one hand and the rights of IPR owners on the other hand.

37. Section 4.1 of the ETSI IPR Policy relates to disclosure of IPRs, and provides that "each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted." Section 15.6 of the ETSI IPR Policy defines the term "ESSENTIAL" to mean that "it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR."

38. Ericsson has complied with the ETSI IPR Policy regarding its patents for which Apple seeks a license. Ericsson timely submits IPR Information Statement and Licensing Declarations to ETSI which identify patents it believes may be, or may become, essential (as defined by the ETSI IPR Policy) in relation to the ETSI work items, standards, and/or technical specifications in accordance with Clause 4.1 of the ETSI IPR Policy.

39. Apple's stated FRAND licensing policy requires essential patent owners, like Ericsson, to prove to Apple's satisfaction "with specificity why each SEP is actually essential, infringed, and not otherwise invalid, exhausted, licensed, or unenforceable." Apple has previously urged the position that patent owners who do not declare Essential Patents in a "timely fashion," in accordance with Clause 4.1, have rendered their patents unenforceable. Ericsson has complied with the ETSI IPR Policy and has timely disclosed its essential patents in accordance with Clause 4.1.

40. ETSI also requests that essential patent holders publicly declare their licensing positions by submitting an IPR Information Statement and Licensing Declaration. Clause 6.1 of the ETSI IPR Policy states that "When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable, and non-discriminatory ("FRAND") terms and conditions under such IPR[.]" The ETSI IPR Policy includes a form IPR Licensing Declaration, which is contractual in nature. As Ericsson owns Essential Patents, Ericsson has declared that it is prepared to grant licenses on FRAND terms and conditions ("FRAND Commitment").

41. Ericsson's has conditioned its FRAND Commitment upon reciprocity, as expressly permitted by Clause 6.1 of the ETSI IPR Policy. Specifically, Ericsson has stated that its FRAND Commitment pertaining to its Essential Patents is subject to the "condition that those who seek licenses agree to reciprocate." As a manufacturer of cellular infrastructure equipment, Ericsson typically negotiates cross-license agreements that provide Ericsson a reciprocal license to the other company's technology.

**C.     Ericsson and Apple's Prior Licenses**

42. Apple designs, manufactures, and markets a portfolio of mobile devices, including in the United States and this District, that comply with the Cellular Standards and utilize Ericsson's Essential Patents. Apple also claims to own essential patents covering cellular standards.

43. Ericsson has licensed its Essential Patents to the smartphone industry for many years. Ericsson has also consummated two prior licenses with Apple pursuant to its FRAND Commitment. Ericsson's previous two licenses with Apple were cross-licenses where Ericsson also received a license from Apple. The first agreement was signed in 2008. The second agreement was signed in 2015. Both agreements contain confidentiality clauses that prevent public disclosure of their specific terms and conditions.

**D.     Apple's Public Accusations That Ericsson's Licensing Program Violates FRAND**

44. For years, Apple has attacked Ericsson, and other essential patent owners, for allegedly violating FRAND. Apple levels its accusations against licensing policies and practices that have been standard, not just in the cellular industry but in other industries, for decades before Apple even first dipped its toe into the cellular market with its first iPhone in 2007. Apple's attacks are part of a self-described strategy to devalue standard essential patents.

45. It is in Apple's financial interest to devalue standard essential cellular patents. Although Apple generally portrays itself as an innovator, that is not the case in the cellular area. Apple has built its cellular patent portfolio primarily by acquiring patents from others; for example, by co-founding the Rockstar Consortium in 2012 and by acquiring some of Intel's patents in 2019. But despite its acquisitions, Apple owns a smaller patent portfolio compared to Ericsson and other major contributors to the 3GPP technical specifications. For the foreseeable future, Apple expects to be a net payor of royalties for cellular essential patents. So Apple stands to benefit financially if it can devalue essential patent royalty rates.

46. A fundamental precept of Apple's devaluation strategy is to artificially increase the transaction costs to global essential patent portfolio holders of licensing their patents, for example, by demanding each patent in a large portfolio be individually examined, valued, and licensed at Apple's option.

47. In 2019, Apple posted a page on its website entitled "A Statement on FRAND Licensing of SEPs." ("Licensing Statement"). On this page, Apple publicly announced what it termed its "core principles to promote fair, reasonable, and non-discriminatory licensing of standard essential patents." Apple claimed its principles were intended to offer a "balanced perspective" in the wake of its "acquisition of the majority of Intel's smartphone modem business, including a significant number of cellular SEPs." But Apple's goal is not balance—it is to artificially devalue essential patents. And the Licensing Statement is not merely Apple's hypothetical wish list—it is a commitment. In the concluding sentence, Apple draws a line in the sand for those who would negotiate with it in the future: "Apple remains committed to these core FRAND principles, now and in the future."

48.     One of Apple's devaluation tactics in its Licensing Statement is for Apple to use its superior financial position to manufacture leverage over patent owners. Ericsson owns thousands of essential patents worldwide. Even though willing cellular patent licensees customarily negotiate and agree to global portfolio licenses, Apple announced in its Licensing Statement that it has the sole discretion to decide whether to "license individual, select groups of, or entire portfolios of SEPs." Apple's Licensing Statement next puts forth the requirement that, for Apple to take a license, the licensor "should prove with specificity why each SEP is actually essential, infringed, and not otherwise invalid, exhausted, licensed, or unenforceable." Apple knows that it would take hundreds of millions, if not billions, of dollars and several human lifetimes to individually adjudicate infringement, essentiality, and validity of the thousands of essential patents owned by Ericsson, then individually value them, in dozens of courts worldwide. By publicly committing to this licensing methodology, Apple intentionally foists the threat of enormous transaction costs on patent owners as a tactic to make them acquiesce to sub-FRAND royalty rates offered by Apple.

49.     Another Apple devaluation tactic is to assert that the FRAND Commitment requires essential patent owners to base their royalties on an artificial and unduly restrictive royalty base that has been rejected by the industry and courts. In its Licensing Statement, Apple requires that, for a portfolio license, the royalty base "should be no more than the smallest salable unit [SSPPU] where all or substantially all of the inventive aspects of the SEP are practiced." Apple has also publicly committed that "[f]or cellular standards, the smallest salable unit should be at most the baseband chip." Apple's inflexible licensing position has been rejected by the industry, by ETSI, and by the courts. This Court has held that "as a matter of French law, the FRAND commitment embodied in the ETSI IPR policy does not require a FRAND license to be based on the SSPPU." *HTC Corp. v. Telefonakitebolaget LM Ericsson*, Case 6:18-cv-00243 (Dkt. 583), *affirmed* 2021

WL 3877749, 12 F.4th 476 (5th. Cir. 2021). Yet Apple has unilaterally (and legally incorrectly) declared that any licenses for Essential Patents not based on SSPPU violate the ETSI FRAND Commitment. Thus, Apple has publicly committed to a licensing position that runs directly contrary to the express terms of the FRAND Commitment, a contract between ETSI and Ericsson governed by French law, as well as precedential rulings of U.S. Courts, and it has put licensors like Ericsson on notice that they must concede to this skewed position in order to reach agreement on a license with Apple

50.     Another Apple devaluation tactic is to try to separate the value of a patent from the value its claimed inventions bestow on the products in which it is used. Apple has publicly accused patent owners, like Ericsson, who base royalties in part on the value recognized by the use of its inventions in consumer products, of "discrimination" in violation of the FRAND Commitment. Apple, in its FRAND Statement, publicly announced that it considers "ASP or use-based methodologies for determining FRAND royalties [as] a back-door for SEP licensors to discriminate between licensees." This position, too, has been rejected by the industry and by U.S. Courts. *See HTC Corp. v. Telefonakitebolaget LM Ericsson*, 2021 WL 3877749, 12 F.4th 476 (5th. Cir. 2021) (affirming district court finding Ericsson's offered 4G rates were FRAND, because comparable licenses in evidence "were based *on the value that Ericsson's product provided to the end-user product*, not just the smallest salable unit.") (emphasis supplied).

51.     Apple posted its FRAND Statement on its website and has maintained it to this day, after Ericsson made its *ex ante* public announcement of its 5G royalty rates, and after 3GPP finalized the technical specifications for the non-standalone and standalone 5G standards. Apple chose to incorporate Ericsson's patented solutions knowing Ericsson's announced rates.

### E. The Parties' Negotiations

52. Ericsson reached out to Apple in late 2020 to begin negotiations regarding a new cross-license, as is Ericsson's typical practice when an existing license is expiring. Given the lengthy negotiations (and litigation) that preceded execution of the 2015 license, Ericsson sought to start negotiations early. License negotiations of this magnitude typically involve both technical discussions—to evaluate and challenge the strength of the other party's patents—and business discussions—to negotiate the terms of the agreement, informed by the feedback from the technical discussions.

53. The parties' negotiations were largely conducted under a non-disclosure agreement. Apple did not depart from its public commitments or retract any of its public assertions that Ericsson's licensing practices violate FRAND.

54. During negotiations, Ericsson provided Apple with a set of 100 claim charts demonstrating essentiality of certain of Ericsson's Essential Patents. The parties agreed to respond to those charts in a subsequent meeting. On September 21, 2021, the parties met to discuss Apple's analysis of and response to Ericsson's claim charts. The negotiations made clear there is a dispute between Apple and Ericsson as to the essentiality, and value, of Ericsson's essential patent portfolio.

55. On October 4, 2021, Ericsson contacted Apple to reiterate its license offer under its publicly announced 5G multimode royalty rates.

56. Apple's conduct in this negotiation parallels its conduct in the parties' negotiations that preceded the 2015 cross license. During those negotiations, while Ericsson's license with Apple was still in force, Apple filed a surprise suit against Ericsson attacking seven Ericsson U.S. patents as not essential and also seeking, in the alternative, a patent-by-patent FRAND adjudication. Apple's history of litigation against Ericsson, as well as other essential patent

15

owners, creates a legitimate prospect of imminent litigation and a justiciable dispute regarding whether Ericsson is prepared to grant a license to Apple on FRAND terms and conditions.

### COUNT I: DECLARATORY JUDGMENT THAT ERICSSON HAS COMPLIED WITH ITS FRAND COMMITMENT AND THE ETSI IPR POLICY

57. Ericsson incorporates by reference the preceding paragraphs as though fully set forth herein.

58. Apple designs, manufactures, and markets products that utilize and comply with the Cellular Standards. Apple requires a license to Ericsson's Essential Patents.

59. Ericsson, as the owner of patents it contends are essential, and remain essential, to ETSI standards, has contractually committed to ETSI that it is prepared to grant licenses under its Essential Patents on FRAND terms and conditions to third parties, such as Apple, who provide equipment fully conforming to the ETSI standards, subject to reciprocity.

60. Apple has asserted a right to a license on FRAND terms and conditions under Ericsson's Essential Patents as an intended third-party beneficiary of Ericsson's contract with ETSI.

61. The construction, validity, and performance of Ericsson's FRAND Commitment is governed by French law.

62. Ericsson has publicly announced its 5G multimode royalty rates that are available to be accepted by handset manufacturers, including Apple.

63. Apple has disputed whether Ericsson's 5G multimode royalty rates and its licensing practices comply with Ericsson's FRAND Commitment, and therefore, whether Ericsson is prepared to grant licenses on FRAND terms and conditions. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

64. Apple has also disputed Ericsson's compliance with the ETSI IPR Policy, in addition to asserting that Ericsson is not prepared to grant licenses on FRAND terms and conditions.

65. Ericsson has negotiated with Apple in good faith. Yet, before and during negotiations with Ericsson, Apple has raised a justiciable dispute regarding whether Ericsson is prepared to grant licenses on FRAND terms and conditions. There is a case or controversy of sufficient immediacy, reality, and ripeness to warrant the issuance of a declaratory judgment.

66. Ericsson requests a declaratory judgment that Ericsson is prepared to grant licenses on FRAND terms and conditions, has negotiated in good faith, and has fully complied with its FRAND Commitment, the terms of its IPR Declaration and Licensing Statement, the ETSI IPR Policy, and all other applicable laws, including U.S. antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Ericsson respectfully requests that this Court enter judgment in its favor as follows and award Ericsson the following relief:

(a) adjudge and declare that Ericsson has complied with its commitment to ETSI that it is prepared to grant licenses to its Essential Patents on fair, reasonable, and non-discriminatory terms;

(b) adjudge and declare that Ericsson has complied with the ETSI IPR Policy in all respects, and all other applicable laws that would affect Ericsson's prospective license to Apple;

(c) award Ericsson the costs of this action, including attorneys' fees; and,

(d) award Ericsson all other relief, in law or equity, to which Ericsson is entitled.

Dated: October 4, 2021.                     Respectfully Submitted,

/s/ *Theodore Stevenson, III*
Theodore Stevenson, III (Lead Attorney)
Texas State Bar No. 19196650
ted.stevenson@alston.com
**ALSTON & BIRD**
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
Telephone: (214) 922-3507
Facsimile: (214) 922-3899

Nicholas Mathews
Texas State Bar No. 24085457
nmathews@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Blake Bailey
Texas State Bar No. 24069329
bbailey@mckoolsmith.com
**MCKOOL SMITH, P.C.**
600 Travis Street, Suite 7000
Houston, TX 77002
Telephone: (713) 485-7300
Telecopier: (713) 485-7344

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 E. Houston Street, Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Telecopier: (903) 923-9099

Christine Woodin
Texas State Bar 24199951
cwoodin@hueston.com
**HUESTON HENNIGAN LLP**
523 West 6th St., Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4099
Facsimile: (888) 775-0898

**ATTORNEYS FOR PLAINTIFFS ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON**