**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON, | Civil Action No. 2:21-cv-376 |
| Plaintiffs | ███████████████ |
| v | |
| APPLE INC., | |
| Defendant. | |
| APPLE INC, | |
| Counterclaim-Plaintiff | |
| v | |
| ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON, | |
| Counterclaim-Defendants. | |

**APPLE INC.'S COUNTERCLAIMS, ANSWER, AND AFFIRMATIVE DEFENSES TO ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON'S FIRST AMENDED COMPLAINT**

Defendant/Counterclaim-Plaintiff Apple Inc. ("Apple"), by and through their undersigned attorneys, hereby state its Counterclaims, Answer, and Affirmative Defenses in response to the First Amended Complaint ("FAC") of Plaintiffs/Counterclaim-Defendants Ericsson Inc. and Telefonaktiebolaget LM Ericsson's (collectively and/or individually referred to as "Ericsson" herein).

## APPLE'S COUNTERCLAIMS

Apple, on personal knowledge of its own acts, and on information and belief as to all others based on its own and its attorneys' investigation, alleges its counterclaims against Ericsson as follows:

## NATURE OF THE ACTION

1.      In December 2015, Apple and Ericsson signed a seven-year license agreement to resolve worldwide litigation, including litigation in which Ericsson asserted patents that it claimed were essential to cellular standards ("SEPs") and that it irrevocably (and voluntarily) promised to license on fair, reasonable, and non-discriminatory ("FRAND") terms.  That license agreement remained in force until mid-January 2022.  That license agreement also should have meant that the parties would not be in court against each other for the duration of the agreement.  Notwithstanding that, and even though the parties had not even begun to discuss commercial terms of a renewed agreement, Ericsson sued Apple in the Netherlands and in this Court before the license expired. Ericsson's actions violated both its FRAND commitments and its agreement with Apple.

2.      In the Netherlands, Ericsson secretly went to court on September 29, 2021 and misrepresented Apple's past conduct to obtain a temporary order that barred Apple from seeking judicial protection against Ericsson's strong-arm tactics.  When Ericsson eventually served Apple with the secret order that Ericsson had obtained from the Dutch court and Apple was allowed to

2

tell its side of the story in that Dutch court, including correcting what Ericsson was forced to concede was a misrepresentation about Apple, the Dutch court lifted the temporary order and also denied Ericsson's subsequent attempt to have it reinstated more permanently.

3.     In this Court, Ericsson's actions were equally illegitimate.  On October 4, 2021, Ericsson sent Apple what Ericsson purports is a FRAND offer—merely a summary of Ericsson's publicly demanded license rates.  *Six minutes later*, Ericsson sued Apple in this Court for allegedly being unwilling to agree to Ericsson's "sticker price" terms.  This action was brought while the parties' 2015 License agreement was still in force.  Ericsson sued rather than negotiate in good faith with Apple, because Ericsson is trying to coerce Apple to pay excessive future royalties in breach of Ericsson's binding FRAND commitments.

4.     Starting January 17, 2021, Ericsson has filed at least thirty-four additional actions against Apple in U.S. District Court, the International Trade Commission ("ITC"), and five other countries, seeking to enjoin Apple or exclude its products in order to coerce Apple into accepting non-FRAND royalties: two actions in the Western District of Texas, three investigations in the ITC, six actions in the Netherlands, five actions in Belgium, two actions in Brazil (one against Apple and one against a reseller of Apple products, Allied Tecnologia SA), fourteen actions in Germany, and at least two actions in Colombia.

5.     In many of these cases, Ericsson has sought to preliminarily enjoin Apple and has even done so on an *ex parte* or secret basis, including in Brazil and Colombia.  Indeed, in Colombia, Ericsson's counsel has refused even to voluntarily identify to Apple all the lawsuits that Ericsson has filed against Apple.

6.     In its wave of litigation that started on January 17, Ericsson has asserted both SEPs against Apple as well as patents that are not claimed to be essential to any standards ("NEPs").

Ericsson's strategy in asserting its NEPs is to use them as leverage to obtain the supra-FRAND royalties it seeks for its SEPs.  Ericsson followed this same playbook before the parties' 2015 litigation, when it asserted an array of SEPs and NEPs and sought injunctions against Apple around the world.

7.      To obtain injunctions and exclusionary relief, Ericsson has distorted the record of the discussions between the parties in a cynical effort to falsely paint Apple as holding out against Ericsson.  For example, in a filing with the ITC on January 17, 2021 in its SEP case against Apple, Ericsson made the startling claim that "Ericsson takes this step only after exhausting all other options to conclude a license with Apple on fair, reasonable, and non-discriminatory ('FRAND') terms."  That claim ignores that even before the parties' prior license had expired, Apple had offered Ericsson both binding arbitration and filed a case in this Court seeking a binding determination of FRAND terms.  Ericsson thus was far from "exhausting" all its options to conclude a license on FRAND terms with Apple when Ericsson went to the ITC.

8.      Ericsson's battery of oppressive litigation, spanning at least thirty-four actions across six countries, makes clear that Ericsson is not complying with its FRAND commitments.

9.      Despite Ericsson's misconduct, Apple remains a willing licensee of Ericsson's patents, and Apple is willing to grant Ericsson a license to Apple's own FRAND-committed patents on FRAND terms.  Apple has proposed to Ericsson that the parties simply extend the terms of the parties' 2015 License agreement with limited revisions for changed circumstances.  Apple has also proposed that if the parties cannot agree on terms for a renewed license, the parties have arbitrators set binding FRAND terms.  But Ericsson has refused these offers and remains intent on holding up Apple for royalties that are far higher than those Apple already pays for the same

patents under the parties' 2015 agreement.  In short, Ericsson is using litigation and strong-arm tactics to demand payments from Apple that are neither fair nor reasonable and are discriminatory.

10.     Apple brings these Counterclaims to seek relief for Ericsson's breach of the parties' 2015 agreement through its premature litigation and its breach of its FRAND commitments.  Apple seeks a declaration that Ericsson has breached (i) the parties' 2015 agreement as well as (ii) Ericsson's FRAND obligation to offer FRAND terms for a new license.  And because Ericsson has consented to such a procedure in this Court and is contractually bound by its voluntary FRAND commitments, Apple also seeks (iii) a binding judicial determination of FRAND terms for Apple to license Ericsson's SEPs globally, including by reference to the terms previously agreed upon by the parties in their 2015 License.

## PARTIES

11.     Apple is a corporation organized under the laws of the State of California, having its principal place of business at One Apple Park Way in Cupertino, California 95014.

12.     When Apple unveiled iPhone in 2007, it revolutionized the telecommunications industry and completely redefined what users can do on their mobile phones.  iPhone combined three products—a groundbreaking mobile phone, a widescreen iPod music player, and a revolutionary computer/Internet communications device—into one small and lightweight handheld device with a large, color multi-touch display; a distinctive user interface; and a sophisticated computing platform for mobile apps.  Apple patented many of these innovations.

13.     In 2010, Apple created and defined an entirely new category of devices with iPad. iPad connected users with their apps and content in a much more intimate, intuitive, and fun way. iPad was an elegantly designed computer tablet with a color multi-touch screen and user interface akin to iPhone, and robust functionality that spans both mobile computing and media storage and

playback.  As a result of its innovative technology and distinctive design, iPad achieved instant success.

14.     In 2015, Apple shook up the emerging wearables market with Apple Watch.  Apple Watch wholly reimagined the computer for the wrist, including a novel user interface that joins a touchscreen and physical buttons.  Within months of its release, Apple Watch became a top selling wearable device in the world.

15.     Apple has continued to revolutionize iPhone, iPad, and Apple Watch with new features, functionalities, technologies, and tools that help users simply do more.  Apple's innovations have been recognized with thousands of patents around the world.  Apple's iPhone, iPad, and Apple Watch products are the result of Apple's own creative achievement, technical innovation, differentiated technology, and astute business judgment.

16.     Among many other functions, iPhone as well as certain models of iPad and Apple Watch can send and receive, over cellular networks, telephone calls and/or other voice and video communications, text messages, and Internet data.  A mobile wireless device, like iPhone, iPad, or Apple Watch, uses a baseband processor chipset to make cellular communications.  The baseband processor chipset is a component that, among other functions, acts as a small wireless radio and "plugs in" to a standardized telecommunications network.  Such networks are created and maintained by cellular service providers, including, for example, AT&T, Verizon, T-Mobile, and U.S. Cellular.  For these carrier companies to deploy a 5G network, certain base stations and other related equipment that support the 3GPP 5G NR standard must be installed and utilized.  Ericsson is one such manufacturer of 5G base stations and other equipment used by cellular service providers.

17.     Telefonaktiebolaget LM Ericsson ("LME") is a Swedish corporation having its headquarters at Torshamnsgatan 21, Kista, 164 83 Stockholm, Sweden.

18.     Ericsson Inc. is a Delaware corporation having a principal place of business at 6300 Legacy Drive, Plano, Texas 75024.  Ericsson Inc. is a wholly-owned subsidiary of LME.

19.     Once a handset manufacturer itself, Ericsson faced "a history of problems in handsets, ranging from supply to clunky designs that did not appeal to consumers."[1]   "[W]ith annual results that barely met analysts' reduced forecasts," in 2001, Ericsson said that "it would stop manufacturing mobile phones, as it trie[d] to shore up a division that is hemorrhaging cash."[2]

20.     Ericsson tried to continue in the handset business through a joint venture.  But as a history of Ericsson on its website documents, after some initial success, the venture struggled to keep up with competitors, including Apple.  As an example, the "Xperia model, also called the X1 and described as a flagship model, was . . . a flop.  The Xperia was launched in the autumn of 2008 . . . and was intended to be a clever means of introducing users to the mobile internet.  But Xperia had too many bugs.  And it could not compete with the iPhone in user-friendliness."[3]

21.     After the collapse of its handset business, Ericsson transitioned to network infrastructure equipment and other businesses.  Those other lines of business include patent

---

[1]     New York Times, *Ericsson's 2001 Loss Is First in 50 Years*, Jan. 26, 2002, https://www.nytimes.com/2002/01/26/technology/ericssons-2001-loss-is-first-in-50-years.html.

[2]     New York Times, *Ericsson Plans to Stop Manufacturing Mobile Phones*, Jan. 26, 2001,        https://www.nytimes.com/2001/01/26/business/ericsson-plans-to-stop-manufacturing-mobile- phones.html.

[3]     Ericsson, *The Problematic Mobile Phone Sector*, https://www.ericsson.com/en/about-us/history/changing-the-world/the-future-is-now/the-problematic-mobile-phone-sector.

licensing and patent assertion.  Ericsson reported approximately 100 signed license agreements, and over $1 billion in licensing revenue in 2020.[4]

## <u>JURISDICTION AND VENUE</u>

22.     This Court has jurisdiction over Apple's claims pursuant to 28 U.S.C. § 1332, because Apple is a citizen of California, LME is a citizen of Sweden, Ericsson Inc. is a citizen of Texas, and the value of the matter in controversy exceeds $75,000.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, during the relevant period, Ericsson has resided and continues to reside in this District.

24.     This Court has both general and specific jurisdiction over Ericsson.

25.     Ericsson Inc. has its headquarters in Plano, Texas in this District.

26.     LME is "a holding company operating worldwide through its subsidiaries and affiliated entities.  The subsidiaries acted as divisions of the parent, rather than separate and independent entities."[5]

27.     LME's Annual Report for 2020 confirms that "[t]he Company is composed of a parent company, Telefonaktiebolaget LM Ericsson, with generally fully-owned subsidiaries in many countries of the world."  One of the largest operating subsidiaries is the fully-owned telecom

---

[4]     Ericsson Annual Report 2020, pdf pp. 7, 17, 18, https://www.ericsson.com/494193/assets/local/investors/documents/2020/annual-report-2020-en.pdf.

[5]     Letter to Simpson Thatcher & Bartlett LLP at A-1-A-2, *U.S. v. Telefonaktiebolaget LM Ericsson*, 19-CRIM-884 (S.D.N.Y. Dec. 6, 2019), https://www.justice.gov/criminal-fraud/file/1226521/download.

vendor company Ericsson Inc., incorporated in the US.[6]  Ericsson Inc. thus acts as an agent of LME.

28.     Ericsson regularly does business or solicits business, engages in other persistent courses of conduct, and derives substantial revenue from products and/or services provided to individuals in Texas.   Ericsson, directly and through subsidiaries or intermediaries, has purposefully and voluntarily placed one or more products and/or services in the stream of commerce related to this dispute with the intention and expectation that they will be purchased and used in Texas.

29.     Further, as described herein, LME breached its license agreement with Apple by filing suit against Apple (together with Ericsson Inc.) before this Court.   Moreover, Ericsson licensing executives based in Texas have negotiated with Apple about Ericsson's SEPs, giving rise to the breaches and unlawful conduct alleged herein.

## BACKGROUND

### A.     ETSI and its Intellectual Property Rights Policy

30.     The European Telecommunications Standards Institute ("ETSI") is an independent, non-profit standard-setting organization ("SSO") that produces globally-accepted standards for the telecommunications industry.   ETSI has more than 900 members from 65 countries across five continents.   ETSI created or helped to create many telecommunication standards, including the 2G GSM, 3G WCDMA/UMTS, 4G LTE, and 5G NR cellular communication standards.

---

[6]     Ericsson         Annual Report 2020     at       33, https://www.ericsson.com/494193/assets/local/investors/documents/2020/annual-report-2020-en.pdf.

31.     ETSI is an Organizational Partner, along with six other regional SSOs, in the Third Generation Partnership Project ("3GPP").  The regional SSO covering the United States is ATIS, the Alliance for Telecommunications Industry Solutions.  Another SSO based in the United States, TIA (Telecommunications Industry Association), is an observer of 3GPP activities.

32.     Under 3GPP's Intellectual Property Rights ("IPR") Policy, individual members "shall be bound by the IPR Policy of their respective Organizational Partner."[7]

33.     3GPP produces technical specifications that are adopted by Organizational Partners, such as ETSI, as standards. 3GPP was created to oversee work on global 3G cellular specifications and has subsequently worked on creating 4G and 5G specifications.  The 3GPP Organizational Partners agreed that members of a particular Organizational Partner would be bound by the IPR policy of that Organizational Partner when participating at 3GPP.

34.     Standards are beneficial because they help allow devices made by one company to communicate with devices made by other companies—that is, these devices can speak the same language.  Standardization helps consumers have confidence that products bought from different manufacturers will interoperate with each other.

35.     But standards can also lead to problems that harm competition and consumers when companies claim to hold patents essential to the standards, and use that as leverage to demand excessive royalties from product companies.  Inclusion of a patent in a standard can confer substantial market power on the holder of that patent.  Before adoption of the standard, alternative technologies compete to be included in the standard, and the SSO has the option of determining not to standardize a particular function.  But once a standard is adopted and a particular manner of

---

[7]      3GPP        Working        Procedures,        Article        55, https://www.3gpp.org/ftp/Information/Working_Procedures/3GPP_WP.htm#Foreword.

implementing the standard is chosen, using those alternatives often may no longer be feasible. Companies that use the standard—such as by supplying cellular devices that operate on networks using the standard—make substantial investments that are tied to using the standard. Because these companies face substantial switching costs in abandoning the standard and finding an alternative means of providing the same functionality or such switching may be completely infeasible, the industry may become "locked in" to a standard.

36.      SSOs have adopted IPR policies to address the potential harms from lock-in of a standard, including the risk that SEP holders can hold up users of the standard by taking advantage of their dependence on the standard, and to ensure that standard setting is pro-competitive and not open to abuse.

37.      ETSI has adopted an IPR Policy, incorporated as Annex 6 of the ETSI Rules of Procedure.[8]  The ETSI IPR Policy is governed by the laws of France and provides in Clause 12 that "[a]ny right granted to, and any obligation imposed on, a MEMBER which derives from French law and which are not already contained in the national or supranational law applicable to that MEMBER is to be understood as being of solely a contractual nature." There is an expectation that ETSI members will abide by the ETSI IPR Policy.

38.      ETSI's IPR Policy was designed to benefit all ETSI members, as well as all other parties that wish to use an ETSI standard. In particular, a stated objective of the Policy, described in Clause 3.1, is to "reduce the risk" to those using the standards or other technical specifications "that investment in the preparation, adoption and application of the STANDARDS could be wasted

---

[8]      ETSI IPR Policy, https://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf.

as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable."

39.     To that end, the ETSI IPR Policy provides that owners of IPRs are to be asked if they will voluntarily submit an irrevocable written undertaking or commitment that they are prepared to grant irrevocable licenses to anyone on "fair, reasonable, and non-discriminatory" or FRAND terms and conditions.  Clause 6 of ETSI's IPR Policy governs the availability of licenses to essential IPR.[9]  In relevant part, Clause 6.1 states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory [FRAND] terms and conditions under such IPR to at least the following extent:
>
> • MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;
>
> • sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;
>
> • repair, use, or operate EQUIPMENT; and
>
> • use METHODS.

The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

---

[9]     The SSOs based in the United States also have IPR policies that govern the availability of licenses to SEPs.   Section 10 of ATIS's Operating Procedures for ATIS Forums and Committees sets out the IPR Policy, which, *inter alia,* adopts the American National Standards Institute Patent Policy.    Operating Procedures for ATIS Forums and Committees (version 5.5), https://www.atis.org/wp-content/uploads/01_legal/docs/OP.pdf. Clause 3.1.1 of TIA's IPR Policy sets out similar obligations.    TIA        IPR        Policy,        https://www.tiaonline.org/wp-content/uploads/2018/05/TIA_Intellectual_Property_Rights_Policy.pdf.

40.     Clause 15 of the ETSI IPR Policy defines IPR as "any intellectual property right conferred by statute law including applications therefor other than trademarks.  For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR."

41.     Further, Clause 15 the ETSI IPR Policy defines "Essential" as follows:

"ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

42.     Obtaining voluntary FRAND commitments enables ETSI to include patented technology in its standards with confidence that owners of declared SEPs will not employ holdup tactics to exploit licensees' investments in the standard (e.g., by demanding unreasonable royalties) that would undermine the subsequent widespread adoption of the standards.  If a FRAND commitment is not provided, the IPR Policy provides for ETSI to attempt to change the standard to avoid the patent or patent application in question.

43.     Appendix A to the ETSI IPR Policy provides IPR Declaration forms through which ETSI members can declare IPRs as potentially essential and commit to licensing such IPRs on FRAND terms and conditions.   In particular, the IPR Declaration provides the option to "irrevocably declare[]" that the IPR owner is "prepared to grant irrevocable licenses":

the Declarant hereby irrevocably declares that (1) it and its AFFILIATES are prepared to grant irrevocable licenses under its/their IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD(S), TECHNICAL SPECIFICATION(S), or the ETSI Project(s), as identified above, to the extent that the IPR(s) are or become, and remain ESSENTIAL   to   practice   that/those   STANDARD(S)   or   TECHNICAL

13

SPECIFICATION(S) or, as applicable, any STANDARD or TECHNICAL SPECIFICATION resulting from proposals or Work Items within the current scope of the above identified ETSI Project(s), for the field of use of practice of such STANDARD or TECHNICAL SPECIFICATION; and (2) it will comply with Clause 6.1bis of the ETSI IPR Policy with respect to such ESSENTIAL IPR(s).

44.     Under the ETSI FRAND regime, a party that has made a voluntary FRAND commitment has "irrevocably" committed its willingness to grant licenses to users of the standard. By contrast, a user of the standard owes no contractual obligation to ETSI or SEP holders; rather, that user has the option to take a license to SEPs on FRAND terms.  SEP holders and users of the standard are thus in very different positions—while SEP holders can be compelled as a matter of contract law to honor their voluntary FRAND commitments, users have made no such commitments.

45.     Patents are also national rights, and a court lacks the authority to adjudicate the merits of patents from other countries.  But in a dispute over FRAND terms for a global portfolio, the parties can consent to a court's authority to resolve the controversy without having to address the merits of all patents.

46.     Ericsson has previously consented to this Court's ability to set global FRAND terms in a breach of contract claim. In litigation against Samsung—where Ericsson alleged that Samsung breached its binding FRAND contractual commitments to ETSI as to its global SEP portfolio—Ericsson consented to this Court's authority to adjudicate a FRAND dispute on a global basis.  For example, Ericsson advocated that "the Court has clear authority to hear Ericsson's FRAND claims."[10]  Further, pointing to cases in which both sides either consented to or sought

---

[10]     Ericsson's Response in Opposition to Samsung's Motion to Dismiss Ericsson's FRAND-Related Claims at 1, *Ericsson Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:20-cv-380-JRG (E.D. Tex. Mar. 17, 2021), ECF 81.

adjudications on a global basis (*e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012)), Ericsson contended that "U.S. courts of appeals have affirmed district courts' subject-matter jurisdiction to adjudicate breach of FRAND claims on a global basis."[11]  As set forth herein, Apple consents to this Court determining FRAND terms for Ericsson's global declared SEP portfolio as part of Apple's breach of contract claim.  Given that the parties have previously entered cross-licenses and Ericsson will need to renew its license to Apple's SEPs at the expiration of the 2015 License, Apple is also willing to have the Court adjudicate terms for Apple's SEPs as part of the overall resolution of the parties' FRAND licensing dispute, if Ericsson wishes to do so.[12]

47.     At the March 16, 2022 scheduling conference, Ericsson agreed to be bound by the global FRAND rate and terms set by this Court.[13]

### B.     Apple's Cellular SEP Licensing Program

48.     Apple is committed to promoting fair, reasonable, and non-discriminatory licensing of SEPs.  Apple values invention, respects intellectual property, and recognizes the pertinent role of developing voluntary industry standards.  Apple believes that standardization is beneficial when it advances marketplace cooperation and interoperability, allowing consumers to have confidence that products reliably interact with other products.  Apple's differentiating features drive demand for all Apple products, while standards allow interoperability with other products around the world.

---

[11]     *Id.* at 7.

[12]     A patent licensor cannot force a prospective licensee to participate in a rate-setting process—the prospective licensee is under no contractual duty to take a license.   (In contrast, a FRAND commitment imposes a contractual duty to ***offer*** FRAND terms to FRAND-committed patents.)

[13]     *See* March 16, 2022 Scheduling Conf. Tr. at 15:5–11.

49.     The core principles guiding Apple's approach to FRAND licensing of SEPs were addressed by Apple a decade ago in a letter to ETSI.  Since then, Apple's approach has retained these core principles with some modifications to reflect changes in the law and evolution of the cellular industry, along with Apple's continuing experience dealing with third parties attempting to abuse the FRAND licensing process.

50.     As part of its commitment to transparency, Apple's FRAND principles are spelled out clearly on its website, https://www.apple.com/legal/intellectual-property/frand/.  They include the following:

- Both SEP licensors and licensees should negotiate transparently and willingly based on an exchange of relevant information.

- Traditional patent law and burdens of proof should be applied to test the merits of SEPs and owners' royalty demands, just as they are for all patents.

- ***FRAND Royalty Base***

  o  There should be a common FRAND royalty base that applies equally to all SEP licensors and SEP licensees.

  o  The common royalty base for SEPs should be no more than the smallest salable unit where all or substantially all of the inventive aspects of the SEP are practiced.

  o  This base should be further apportioned to isolate the SEP value, separate and apart from prior art, non-patented features, other patented technologies, standardization itself, and contributions and innovations of others (i.e., materials, manufacturing, marketing, etc.).

  o  For cellular standards, the smallest salable unit should be at most the baseband chip.

- ***FRAND Royalty Rate***

  o  A FRAND royalty rate should be proportional among SEP licensors and comparable among SEP licensees.

  o  A SEP licensor's pro rata share of declared SEPs is an objective reference point in a FRAND negotiation.

o An objective reasonable royalty rate protects against SEP licensors being unjustly enriched through excessive royalties (i.e., royalty stacking) to the detriment of both SEP licensees and other SEP licensors and contributors, as well as consumers.

o An objective reasonable royalty rate applied to a common royalty base protects SEP licensees from cumulative, excessive royalties.

o ASP or use-based methodologies for determining FRAND royalties are a back-door for SEP licensors to discriminate between licensees, to charge different royalties for the same SEPs, and to capture value attributable to licensee innovations.

## C.    Ericsson's SEP Licensing Program

51.    Ericsson has a portfolio of SEPs it has declared essential to the cellular standards ETSI has promulgated and for which it has made voluntary, irrevocable commitments to ETSI to license on FRAND terms and conditions in return for the benefit of being able to license the large number of companies that use globally-adopted standards.

52.    As Ericsson has long described its approach to licensing SEPs, the SEP holder's proportionate share of SEPs is an important consideration in determining FRAND royalties—i.e., the larger the share of the SEP stack, the higher the royalties; lower the share of the SEP stack, the lower the royalties.   For example, in a 2002 press release, Ericsson and other industry participants stressed setting rates "proportional" to each company's number of SEPs:[14]

> Industry leaders NTT DoCoMo, Ericsson, Nokia and Siemens today reached a mutual understanding to introduce licensing arrangements whereby essential patents for W-CDMA are licensed at rates that are proportional to the number of essential patents owned by each company.

---

[14]    Nokia Press Release, *Industry leaders NTT DoCoMo, Ericsson, Nokia and Siemens, and Japanese manufacturers reach a mutual understanding to support modest royalty rates for the W-DCMA technology worldwide*, Nov.   6,   2002,   available   at https://www.sec.gov/Archives/edgar/data/924613/000110465902006769/j6199_6k.htm.

Likewise, in a 2006 submission to ETSI made with other ETSI members, Ericsson took the position that "compensation under FRAND must reflect the patent owner's proportion of all essential patents."[15]

53.    In 2007, Ericsson's then-Chief Financial Officer, Karl-Hendrik Sundstrom, described Ericsson's efforts to get "more essentials"—i.e., more SEPs—to benefit Ericsson in cross licensing.[16]

54.    Also in 2007, Ericsson explained that "[i]n practice, FRAND means reasonable accumulated IPR costs where the contributors are compensated proportionally in relation to their patent portfolio within a standard."[17]   Similarly, in a 2012 submission to the International Telecommunications Union, Ericsson elaborated on the concept of proportionality for determining royalties and the need to justify a requested royalty in bilateral negotiations: "It is Ericsson's position that patent holders need to consider their contribution to a particular standard, in relation to other contributions, when setting their FRAND royalty, and that a FRAND offer needs to be substantiated by argument in bilateral negotiation, where the licensee is also allowed to challenge such substantiation."[18]

### D.    Ericsson Has Recognized That Injunctions Are Inconsistent With FRAND Commitments

55.    Although Ericsson's current holdup strategy seeks injunctions against Apple in an effort to extract supra-FRAND royalties, Ericsson previously and correctly recognized that its

---

[15]    Ericsson, Motorola, Nokia, *Proposal for IPR Policy Reform to ETSI*, Jan. 10-11, 2006.

[16]    LM Ericsson Q2 2007 Earnings Call Transcript at 18 (July 20, 2007) (alteration supplied).

[17]    Ericsson, *Ericsson Intellectual Property – A driver for state-of-the-art telecommunications technology*, Feb. 2007.

[18]    Jonas Sundborg, *Ericsson on FRAND and SEP Litigation* at 5, ITU Patent Roundtable, Oct. 10, 2012.

FRAND commitments should prevent it from doing so.  As described above, Ericsson's business has changed over the years to increasingly focus on patent licensing after its efforts in selling mobile devices fell flat.  As Ericsson's business imperatives have shifted, so too has its view of the ETSI FRAND commitment, even though the language of that commitment has remained largely unchanged.

56.     Ericsson admitted in prior litigation in 2006 that parties that are "contractually bound and obligated to grant … licenses … are not entitled to [] exclusion order[s] or cease and desist order[s]."[19]  In particular, Ericsson admitted that "seeking to obtain permanent exclusion and cease and desist orders is contrary to and in violation of [the] commitment to adhere to the FRAND policy which assures that no patent own can exclude competitors from the marketplace."[20]

57.     Ericsson also took the position that the "right to [FRAND] license is inconsistent with and precludes a grant of the exclusionary remedies."[21]  Ericsson advanced this position before the Federal Trade Commission.  In 2011, the FTC sought comments on the treatment of patented technology included in standards by SSOs.  In response, Ericsson explained that when there is a FRAND commitment, "injunctions should not be allowed as a first means; i.e., without even engaging in bona fide licensing discussions."[22]

---

[19]     *See* Amended Response to the Complaint ¶ 130, *Certain Wireless Communication Equipment*, Inv. No. 337-TA-577 (Aug. 29, 2006).

[20]     *Id.* ¶ 148.

[21]     Resps.' Mot. Partial. Summ. J. and Partial Termination with Respect to Samsung's Declared Essential Patents, *Certain Wireless Communication Equipment*, Inv. No. 337-TA-577 (Jan. 19, 2007).

[22]     Ericsson's Response to FTC's Request for Comments at 7 (Standard Setting Workshop, Project No. P111204) (Aug. 5, 2011), *available at* https://www.ftc.gov/policy/public-comments/comment-00049-9.

58.     In 2008, Gustav Brismark, Ericsson's Vice President of Patent Strategy and Portfolio Management, and Kasim Alfalahi, Ericsson's Vice President and General Manager of IPR, Licensing and Patent Development wrote an article asserting that companies participating in SSOs "waive their rights to a monopoly and promise to license all of the individual patents on fair and reasonable terms," which means that "no one can be stopped and new players are able to join."[23]

59.     In 2008, Brismark gave a presentation to the International Patent Forum where he explained that a "FRAND commitment means no blocking patents" and that "fair compensation" means "waiving monopoly"—i.e., forgoing the right to exclude:[24]



---

[23]     Gustav Brismark & Kasim Alfalahi, *Patent strategies - a fork in the road toward 4G*, Ericsson Bus. Rev., 2008 (3) (2008).

[24]     Gustav Brismark, Ericsson, *Licensing and Tech Transfer – Making the Most Out of Your Patent* at 5, 2011, *available at* https://nanopdf.com/download/patent-pools-managing-intellectual-property_pdf.

60.     In 2013, Nina MacPherson, then Ericsson's Senior Vice President, General Counsel and Head of Group Function Legal Affairs, gave an interview to Competition Magazine where she reiterated Ericsson's position that "a SEP owner should not seek injunctive relief using its standard-essential patents against a potential licensee prior to seeking to conclude a license on FRAND terms."[25]

61.     In prior litigation at the ITC, Ericsson also asserted that "Samsung's refusal to grant a license to Ericsson, despite its obligation to do so, precludes issuance of an exclusion order or any other remedy in this Investigation."[26]

**E.     Apple and Ericsson's 2015 License**

62.     On December 21, 2015, Ericsson announced that it entered a new license with Apple for Ericsson's cellular SEPs:[27]

> Ericsson and Apple have agreed on a global patent license agreement between the two companies. The agreement includes a cross license that covers patents relating to both companies' standard-essential patents (including the GSM, UMTS and LTE cellular standards), and grants certain other patent rights. In addition, the agreement includes releases that resolve all pending patent-infringement litigation between the companies.
>
> As part of the seven-year agreement, Apple will make an initial payment to Ericsson and, thereafter, will pay on-going royalties.

---

[25]     Concurrences, No. 3-2013, Nina Macpherson: *Competition Perspectives from the innovation frontier*, *available at* https://www.concurrences.com/en/review/issues/no-3-2013/interview/nina-macpherson-ericsson-competition-perspectives-from-the-innovation-frontier-53109.

[26]     *See* Response of Ericsson Inc. and Telefonaktiebolaget LM Ericsson ¶ 47, *Certain Wireless Communications Equipment and Articles Therein*, Inv. No. 337-TA-866 (March 8, 2013).

[27]     Ericsson Press Release, *Ericsson and Apple Sign Global Patent License Agreement, Settle Litigation* (Dec. 21, 2014).

63.     Ericsson further disclosed that "[i]ncluding positive effects from the settlement, and including the ongoing IPR business with all other licensees, Ericsson estimates full year 2015 IPR revenues will amount to SEK 13-14 b," which in 2015 translated to approximately $1.5-1.6 billion.[28]

64.     Under the parties' 2015 ███████████████████████





70.     Although  the ████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████ this dispute is properly before this Court because, as described herein, Ericsson put
the agreement at issue before this Court through its lawsuit here. ████████████████████

**F.     Apple and Ericsson's Discussions of a New License, Ericsson's Premature Litigations, and Ericsson's Wave of Injunctive Requests**

72.     Over the course of the past decade, and especially in the years following the parties'
2015 License agreement, Apple's involvement in the development of standardized technologies
and participation in various aspects of SSO policy discussion has deepened.  Apple participates in
approximately over 100 diverse SSOs, including ETSI, and Apple has contributed to the
advancement of a wide range of standards, including those developed by 3GPP.

73.     Apple has also invested resources toward cultivating its cellular SEP portfolio, both
organically and through strategic acquisitions.  For example, Apple has actively participated in the

---

35 ████████████████

█ ████████████

37      *Id.*

development of the 5G specifications at 3GPP.  When Apple acquired Intel's smartphone modem business in 2019, it also acquired Intel's patents for then-existing and future wireless technology. Apple holds over 17,000 wireless technology patents, ranging from protocols for cellular standards, including 3GPP, to modem architecture and modem operation.

74.     Since the parties' 2015 agreement, Ericsson's overall share of declared cellular SEPs has decreased by approximately 25% while Apple's share has increased by approximately 500%.  Today, Apple holds a share of declared 5G patent families that is comparable to Ericsson's share.   Given these facts, under any cross license between Ericsson and Apple, Apple's net payments to Ericsson should decrease as compared to under the 2015 License.

75.     Starting in late 2020, Ericsson and Apple began high-level discussions regarding a schedule for negotiating renewal of their license agreement in advance of the expiration of its seven-year term.  Throughout the parties' discussions, Apple has made it clear that it is willing to take a license to Ericsson's SEP portfolio on FRAND terms, and do so irrespective of Ericsson taking a license to Apple's SEP portfolio.

76.     Ericsson and Apple agreed that the license negotiations would be conducted under a non-disclosure agreement.  Ericsson refused to provide any patent-specific materials until the non-disclosure agreement was in effect.  Ericsson insisted that the parties stick to the last non-disclosure agreement agreed upon by the parties for the 2015 License negotiations, and, for the sake of continuity and expediency, Apple agreed.

77.     Less than two weeks after signing the non-disclosure agreement, on June 9, 2021, Apple proposed a detailed schedule for technical discussions, including the information to be exchanged between the parties.   Apple advised that it would be prepared to start technical

discussions earlier than the July 2, 2021 date that Ericsson requested so that the parties would have time for a full and robust technical discussion.

78.     On June 18, 2021, Ericsson responded to Apple's proposed schedule by delaying the start of discussions even further, until the end of August, to accommodate Ericsson's European summer holidays.

79.     On June 25, 2021, Apple stated its disappointment at the delayed start of the parties' technical discussions and exchange of claim charts until the end of August.  Apple requested that Ericsson consider whether it was prepared to start earlier.  Apple also requested that the parties exchange their respective list of SEPs in early July in order for each side to understand what the other believed it needed to license.

80.     On July 2, 2021, Ericsson refused Apple's request to exchange lists of SEPs, instead offering to discuss providing a list of all SEPs after the parties' technical discussions of claim charts were completed.

81.     Apple reiterated its request to exchange lists of SEPs on July 13, 2021.  In response, Ericsson refused to provide a specific list of patents and instead referred Apple to all declarations Ericsson has made to ETSI: "As for a list of Ericsson's declarations, that information is publicly available and can be located on the ETSI website (https://ipr.etsi.org/)."

82.     On August 20, 2021, the parties exchanged the first of three rounds of technical information, with both sides providing SEP claim charts.  The parties met on September 21, 2021 to discuss feedback on a subset of the first round of exchanged technical information, per the parties' agreement.  On September 27, 2021, the parties exchanged the second round of technical information, with both sides providing SEP claim charts.  The parties met on October 26, 2021 to discuss feedback on a subset of the second round of exchanged technical information, per the

26

parties' agreement.  On November 1, 2021, the parties exchanged the third and final round of technical information, with both sides providing SEP claim charts.  The parties met on November 30, 2021 to discuss feedback on a subset of the third round of exchanged technical information, per the parties' agreement.  During these discussions, Apple raised concerns about the essentiality of a subset of the technical information Ericsson provided.

83.    One day before the first technical meeting, on September 20, 2021, Ericsson requested business discussions to be set up in parallel to the technical discussions, and offered to "provide an update on Ericsson's overall business, our licensing program and present our cross-license proposal."

84.    On September 29, 2021, Apple requested that the business discussions tentatively scheduled for October 5, 2021 pending Ericsson's confirmation of its availability include an exchange of certain additional patent information to facilitate understanding the scope and value of the parties' respective cellular SEP portfolios.  Apple did not condition business (or technical) discussions on Ericsson's willingness to provide the requested information.  Specifically, Apple requested, for each patent family that Apple or Ericsson contends contains one or more active, declared cellular SEPs, identifying (a) representative patent number; (b) the standard(s) to which the party claims it is essential; (c) exemplary standard section citations for the representative patent, if available; (d) related family members for the representative patent;  additional citations to standard sections for the related patents, if available; (f) whether such patent (or application it depends from) existed as of the parties' prior agreement in 2015.  Apple also proposed that the parties identify all declared cellular SEPs that were active (i.e., either an actively pending application or an issued, unexpired patent) in 2015, but that have since expired or are no longer owned, because such information would assist the parties in using the 2015 agreement as a starting

27

point for commercial terms, in that the patents added since 2015 can be better compared to those still remaining from 2015.

85.     Unbeknownst to Apple, on September 29, 2021—the same day that Apple sent a letter to Ericsson outlining its goals for the parties' first business meeting—Ericsson secretly initiated litigation against Apple in the Netherlands, as described more fully below.

86.     Ericsson responded to Apple's request the next day, on September 30, 2021, declining to exchange the specific items during the business discussions, as Ericsson "believe[d] that much of the information has been or will soon be exchanged in connection with our ongoing technical discussions."  In that same correspondence, Ericsson confirmed the October 5, 2021 meeting. Ericsson again said nothing about the proceeding it had already initiated in the Netherlands.

87.     On October 4, 2021, at 2:25 p.m. Pacific time, Ericsson emailed Apple that "[i]n advance of our business meeting tomorrow, we wanted to provide you with an advance copy of our licensing presentation.  As you will see, Ericsson is willing to continue to offer Apple our publicly announced 5G multimode rate of $5 per phone (with a $1 early signing discount), a rate which we will continue to honor assuming we execute a license relatively quickly."  Ericsson's email did not mention that it had already sued Apple in the Netherlands.  And Ericsson has subsequently contended that this email provided Apple with an "offer"—notwithstanding that it simply ignored the terms of the parties' prior agreement in favor of Ericsson's "sticker prices."

28

88.   ***Just six minutes later***—at 2:31 p.m. Pacific—Ericsson sued Apple again, this time by complaining to this Court that "[t]he negotiations made clear there is a dispute between Apple and Ericsson as to the essentiality, and value, of Ericsson's essential patent portfolio."[38]

89.   Notwithstanding that the 2015 License remained in force ███████████████████ ████████████████   Ericsson sought declarations that "Ericsson has complied with its commitment to ETSI that it is prepared to grant licenses to its Essential Patents on fair, reasonable, and nondiscriminatory terms" and "that Ericsson has complied with the ETSI IPR Policy in all respects, and all other applicable laws that would affect Ericsson's prospective license to Apple."[39]

90.   Ericsson alleged that FRAND licensing is typically reciprocal:[40]

> Ericsson's [*sic*] has conditioned its FRAND Commitment upon reciprocity, as expressly permitted by Clause 6.1 of the ETSI IPR Policy. Specifically, Ericsson has stated that its FRAND Commitment pertaining to its Essential Patents is subject to the "condition that those who seek licenses agree to reciprocate." As a manufacturer of cellular infrastructure equipment, Ericsson typically negotiates cross-license agreements that provide Ericsson a reciprocal license to the other company's technology.

Further, Ericsson also acknowledged that "Ericsson has also consummated two prior licenses with Apple pursuant to its FRAND Commitment.  Ericsson's previous two licenses with Apple were cross-licenses where Ericsson also received a license from Apple."[41]  Further, Ericsson alleged that the parties' current negotiations are directed to a "new cross-license."[42]

---

[38]   Original Complaint ¶ 54, *Ericsson Inc. v. Apple Inc.*, No. 2:21-cv-376 (E.D. Tex. Oct. 4, 2021).

[39]   First Amended Complaint, *Ericsson Inc. v. Apple Inc.*, No. 2:21-cv-376 (E.D. Tex. March 24, 2022) at 22–23.

[40]   *Id.* at ¶ 45.

[41]   *Id.* at ¶ 48.

[42]   *Id.* at ¶ 57.

29

91.     Ericsson conceded that Apple owns a "cellular patent portfolio" to which Apple has added patents through acquisition, including patents Apple acquired from Intel in 2019.[43]   But Ericsson alleged that "Apple owns a smaller patent portfolio compared to Ericsson and other major contributors to the 3GPP technical specifications" and so "[f]or the foreseeable future, Apple expects to be a net payor of royalties for cellular essential patents."[44]   Accordingly, Ericsson alleged that Apple has determined that notwithstanding owning SEPs, it "stands to benefit financially if it can devalue essential patent royalty rates."[45]   Ericsson thus accused Apple of seeking to devalue all SEPs—including Apple's own.

92.     Ericsson repeatedly alleged that Apple's public positions on SEP licensing violate FRAND, including:

- "Apple's self-proclaimed and highly publicized FRAND licensing principles (many of which have been expressly rejected by courts and by the industry)";[46]

- Apple "requiring royalties be calculated on the now-rejected SSPPU theory";[47]

- "Nor has Apple retreated from its prior public assertions that the only way to comply with FRAND is to adhere to Apple's self-declared methodology for licensing essential patents, despite court decisions that flatly rejected Apple's approach to cellular essential patent licensing";[48]

- "Another Apple devaluation tactic is to assert that the FRAND Commitment requires essential patent owners to base their royalties on an artificial and

---

[43]     *Id.* at ¶ 50.

[44]     *Id.*

[45]     *Id.*

[46]     *Id.* ¶ 10.

[47]     *Id.* ¶ 11.

[48]     *Id.* ¶ 17.

unduly restrictive royalty base that has been rejected by the industry and courts";[49] and

- "Apple's inflexible licensing position has been rejected by the industry, by ETSI, and by the courts."[50]

93.     Ericsson thus accused Apple of devaluing not just others' SEPs but Apple's own SEPs and violating Apple's FRAND commitments, ████████████████████████████

████████████████████████████████████

94.     Further, Ericsson alleged that, notwithstanding Apple's current license to Ericsson's patents, "there is a dispute between Apple and Ericsson as to the essentiality, and value, of Ericsson's essential patent portfolio."[51]

95.     In addition to its October 4, 2021 case in this Court, Ericsson has pursued litigation in the Netherlands.  There, on September 29, 2021, Ericsson approached a court in secret, without giving prior notice to Apple, to obtain a temporary order stopping Apple from preventing or interfering with Ericsson's pursuit of injunctions or infringement litigation throughout the world— in other words, Ericsson sought from the Dutch court an anti-anti-suit injunction to prevent Apple from obtaining anti-suit injunctions against Ericsson anywhere in the world.

96.     On October 4, 2021, without Apple's knowledge of Ericsson's claims or giving Apple an opportunity to contest them, and thus without having heard from Apple at all, the Dutch court granted Ericsson's request and issued a temporary order prohibiting Apple from seeking an anti-suit injunction against Ericsson patent assertions in the Netherlands with the threat of a penalty of €10 million for a violation, to be increase by €1 million per day to a maximum fine of €100

---

[49]     *Id.* ¶ 54.

[50]     *Id.*

[51]     *Id.* ¶ 59.

million—notwithstanding that Apple was then licensed to Ericsson's patents.  But in pursuing its requests, Ericsson misled the Dutch court.  Ericsson argued that there was a risk that Apple would seek such an anti-suit injunction because Apple had previously done so against Qualcomm, writing that "[i]n its most recent global dispute with Qualcomm, Apple also in fact applied for an ASI."[52] This was a misrepresentation.  In that case, it was Qualcomm, not Apple, that sought an anti-suit injunction.  *See Apple Inc. v. Qualcomm Inc.*, No. 317CV00108GPCMDD, 2017 WL 3966944, at *1 (S.D. Cal. Sept. 7, 2017) ("Before the Court is a motion for anti-suit injunction filed by Defendant and Counterclaim-Plaintiff Qualcomm Incorporated").

97.     Ericsson also informed the Dutch court that, notwithstanding the parties' license, it would seek rulings against Apple that certain of its SEPs are essential to the 4G and/or 5G standard and are valid: "Ericsson intends to initiate *inter partes* actions shortly after the submission of the present writ of summons and also prior to the expiry of the aforementioned license with Apple. Ericsson will, amongst others, request the court in The Netherlands to already confirm that the patents relied on are indeed valid and essential to the 4G and/or 5G standards."[53]   Ericsson also attached to its filing two draft summonses for enforcement of European patents that are licensed under the 2015 License.  When asked by the Dutch court at a November 18, 2021 hearing about its strategy for the two enforcement actions, Ericsson's counsel explained that Ericsson intended to later amend its prayer for relief to seek to enjoin Apple from infringing those patents.  Ericsson's counsel elaborated that Ericsson intended to get a head start in litigation and not lose time having to wait until the 2015 License expires before bringing suit against Apple.

---

[52]     Ericsson Writ of Summons Interim Relief Proceedings ¶ 94 (English translation served by Ericsson).

[53]     *Id.* ¶ 18.

98.     After hearing Apple's arguments on October 8, the Dutch court lifted the temporary injunction in an October 18 order.   The court concluded that, stripped of its reliance on the *Qualcomm* case, Ericsson had offered no proof that Apple presented sufficient threat that it would seek an anti-suit injunction against Ericsson.   Ericsson continues to appeal that determination.   On April 5, 2022, the Dutch appellate court dismissed Ericsson's claims for interim relief.

99.     In addition to its request for a temporary injunction, Ericsson requested that the Dutch court, after hearing from Apple, enjoin Apple from pursuing anti-suit injunctions on a longer-term and on global basis.   But on December 16, 2021, the Dutch court rejected Ericsson's request for such an injunction of global applicability against Apple.

100.    On October 5, 2021, Apple wrote to Ericsson to inform it that Ericsson is "contractually barred from bringing" its lawsuits in this Court and in the Netherlands.   Ericsson responded on October 5, 2021, stating that, despite suing first in the Netherlands and then in this Court, "we do not wish to derail our negotiation track."

101.    On October 10, 2021, Apple again wrote to Ericsson, describing that "the day before the first business discussion was set to occur, Ericsson filed actions in various courts, clearly breaching Ericsson's contractual commitments and disrupting the negotiations."   Ericsson has refused to withdraw its lawsuits.

102.    Ericsson chose litigation over negotiation because it is interested in obtaining significantly more from Apple in royalties than under the parties' prior license—even considering the change in the parties' respective SEP holdings since then in a way that benefits Apple. Ericsson's assertions to Apple now about suing first and negotiating later differ sharply from Ericsson's position when HTC sued Ericsson in the midst of negotiations.   Then, Ericsson was unequivocal that such tactics foreclosed meaningful negotiations:

- "[B]efore Ericsson could respond to HTC's offer, and while Ericsson believed the parties were still negotiating in good faith, HTC sued Ericsson . . . shutting the door on continued business negotiations."[54]

- "HTC unilaterally put an end to the parties' negotiations when it filed a lawsuit against Ericsson."[55]

- "HTC's lawsuit demonstrates that HTC never intended to negotiate with Ericsson in good faith, had no plans to pay a FRAND royalty for Ericsson's essential patents, and would not offer a FRAND license (or any license at all) for its essential patents."[56]

103.    On October 27, 2021, notwithstanding Ericsson's conduct, Apple tried again to resolve the parties' dispute by proposing binding arbitration of FRAND terms.  Although Ericsson has claimed it is willing to arbitrate, Ericsson refused to accept Apple's proposal without offering any valid justification why.  As Apple explained to Ericsson in a December 14, 2021 letter, Ericsson's conduct demonstrates that it is not really interested in arbitration despite its claims to the contrary.

104.    Not until November 2, 2021—more than a month after it had first initiated litigation against Apple in the Netherlands and almost a month after it filed this case—did Ericsson provide Apple with the complete terms of a proposed license.  But rather than recognize the terms of the 2015 License, Ericsson proposed that the parties start over from Ericsson's "standard cross licensing agreement."

105.    On November 19, 2021, Apple wrote to Ericsson to propose extending the parties' existing license ███████████ with some modifications to account for changes since 2015.  These

---

[54]    Defendants Telefonaktiebolaget LM Ericsson and Ericsson Inc.'s First Amended Answer and Counterclaims at 2, *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, No. 6:18-cv-00243-JRG (E.D. Tex. June 4, 2018), ECF 89.

[55]    *Id.* at 26.

[56]    *Id.* at 27.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████was

generous to Ericsson in light of the fact that Ericsson's share of declared SEPs had declined since

2015, while during that same period Apple's share had grown significantly, and the fact ███

████████████████████████████████████████████   Ericsson declined

Apple's offer.

106.    On November 22, 2021, Apple wrote to Ericsson about its breaches of the 2015

License and again asked whether Ericsson would dismiss its improper lawsuits against Apple.

Apple also asked Ericsson whether it would insist on using its publicly-announced rates as the

basis for negotiation rather than the terms of the parties' existing agreement.  Ericsson's response

did not answer those questions, instead claiming that they had been previously addressed by

Ericsson during the parties' negotiations.

107.    On December 17, 2021, before the 2015 License expired, Apple filed a complaint

asking this Court to resolve the parties' dispute by setting FRAND terms for a global license to

Ericsson's declared SEPs.  On the same day, Apple proposed that the parties agree not to pursue

any patent claims in the interim and, in particular, not to pursue any claims for injunctions that

would be used as leverage to derail the setting of FRAND terms.

108.    Nevertheless, since January 17, 2021, Ericsson filed at least thirty-four additional

actions against Apple in U.S. District Court, the ITC, and five other countries, seeking to enjoin

Apple or exclude its products in order to coerce Apple into accepting non-FRAND royalties: two

actions in the Western District of Texas, three investigations in the ITC, six actions in the

Netherlands, five actions in Belgium, two actions in Brazil (one against Apple and one against a

reseller of Apple products, Allied Tecnologia SA), fourteen actions in Germany, and at least two actions in Colombia.

109.    Apple's concern about Ericsson's holdup strategy is well founded.  Ericsson has a history of seeking injunctions on both declared SEPs and NEPs as a means to coerce licensees to accept non-FRAND royalties.  Indeed, in 2015 when Ericsson sued Apple in the ITC in two different cases, one asserting SEPs and one NEPs, and sought to exclude Apple products from importation into the United States, Ericsson was candid about its strategy.  In both cases, Ericsson explained that, where licensees "are unwilling [to] enter into a license agreement, Ericsson invests in patent enforcement litigation to motivate those unwilling licensees to license the applicable Ericsson patent portfolios."[57]  Ericsson elaborated that "[i]n those patent enforcement proceedings, Ericsson asserts representative patents from the applicable portfolios."[58]

110.    On March 25, 2022, Apple followed up on its January 14, 2022 license offer to Ericsson with further confirmation of Apple's intent to obtain a resolution on FRAND terms through this proceeding.  Apple's letter included as an attachment a copy of the agreement to extend the terms of the 2015 License ███████████ similar to the version Apple sent on November 19, 2021, but with blanks for the annual and cumulative amount payments from Apple to Ericsson to be filled in by the Court through this proceeding.  As Apple explained in the letter: "Apple is

---

[57]    Verified Complaint of Ericsson Inc. and Telefonaktiebolaget LM Ericsson Under Section 337 of the Tariff Act of 1930, as Amended ¶ 118, *Certain Electronic Devices, Including Wireless Communication Devices, Tablet Computers, Digital Media Players, and Cameras*, Inv. No. 337-TA-952 (Feb. 26, 2015); Verified Complaint of Ericsson Inc. and Telefonaktiebolaget LM Ericsson Under Section 337 of the Tariff Act of 1930, as Amended ¶ 160, *Certain Wireless Standard Compliant Electronic Devices, Including Communication Devices and Tablet Computers*, Inv. No. 337-TA-953 (Feb. 26, 2015).

[58]    *Id.*

committing to the attached license terms—based on the parties' prior license terms—with the monetary terms to be set by the FRAND-adjudication case in Texas.  Thus, the Texas case would result in a complete and binding license agreement—the monetary adjudication would complete the agreement."

## COUNT I

### (Breach of the 2015 License Agreement)

111.    Apple restates and incorporates by reference each allegation set forth above.

112.    The █████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████

113.    On October 4, 2021, Ericsson filed a complaint in this Court that acknowledged that Apple has SEPs that are subject to FRAND commitments and accused Apple of conduct that breaches FRAND. ██████████████████████████████████████████████████
████████

114.    Moreover, Ericsson alleged that there is a dispute between Apple and Ericsson regarding the "essentiality, and value, of Ericsson's essential patent portfolio" and, on that basis, filed suits in this Court and in the Netherlands.  But the parties' agreement—█████████████████
██████████████████████████████████—was still in force, and thus there was no legally actionable present dispute about the value or essentiality of those patents.  To the contrary, Apple and Ericsson had agreed on terms to address any such dispute through the end of the 2015 License, and Apple paid Ericsson for its rights to Ericsson's patents.  By filings its actions in this

Court and the Netherlands, Ericsson deprived Apple of the full benefit of the 2015 License and breached the 2015 License.

115.    As a result of Ericsson's breaches of the 2015 License, Apple has been injured. Apple has sustained injury to its business and property, including Apple's costs and expenses relating to negotiations with Ericsson and defending against Ericsson's complaints in this Court and in the Netherlands and in pursuing this action, in an amount to be determined at trial.

<strong>COUNT II</strong>

<strong>(Breach of Ericsson's FRAND Contractual Commitment)</strong>

116.    Apple restates and incorporates by reference each allegation set forth above.

117.    As set forth above, by committing to license its declared SEPs to users of ETSI's cellular standards on FRAND terms, Ericsson entered into contractual commitments with ETSI and its members, including Apple.

118.    Every party producing products that support ETSI cellular standards, including Apple, is an intended third-party beneficiary of Ericsson's contractual commitments to ETSI— specifically Ericsson's commitment to grant licenses on FRAND terms to all that make, use, or sell products supporting the ETSI cellular standards.

119.    Ericsson is obligated to offer a license to its essential patents to Apple consistent with the ETSI IPR Policy, including that such a license be on FRAND terms.

120.    Apple was entitled to rely on Ericsson's FRAND commitments, both as an ETSI member and as a third-party beneficiary.

121.    Ericsson breached its FRAND commitments in its conduct with Apple in multiple ways.  First, by initiating litigation in the Netherlands on September 29, 2021 and in this Court on October 4, 2021—even before the parties began their commercial discussions and when the

parties' current agreement remains in force—Ericsson breached its commitments to be prepared to license its cellular SEPs on FRAND terms and conditions.  As Ericsson acknowledged in its litigation with HTC, a party that prematurely resorts to litigation in this manner is not genuinely interested in reaching a license on FRAND terms and conditions but in improperly using the leverage of litigation to its advantage.[59]  Ericsson further acknowledged in comments to the FTC that seeking an injunction "should not be allowed as a first means; without even engaging in bona fide licensing discussions."[60]  Ericsson explained: "The whole purpose of the (F)RAND commitment is that standard adoption should not be blocked (unless a user is unreasonably refusing to take a necessary license)."[61]

122.    Second, by filing at least ***thirty-four*** actions across six different countries, Ericsson has made clear that it is not seeking FRAND terms and conditions, but is instead attempting to coerce Apple into accepting non-FRAND terms under threat of injunction and exclusion from major markets.  Ericsson itself decried this exact behavior, arguing that "seeking to obtain permanent exclusion and cease and desist orders is contrary to and in violation of [the]

---

[59]     Defendants Telefonaktiebolaget LM Ericsson and Ericsson Inc.'s First Amended Answer and Counterclaims at 2, *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, No. 6:18-cv-00243-JRG (E.D. Tex. June 4, 2018), ECF 89 at 27.

[60]     Ericsson's Response to FTC's Request for Comments at 7 (Standard Setting Workshop, Project No. P111204) (Aug. 5, 2011), *available at* https://www.ftc.gov/policy/public-comments/comment-00049-9.

[61]     *Id.*

commitment to adhere to the FRAND policy which assures that no patent owner can exclude competitors from the marketplace."[62]

123.    Third, to the extent that Ericsson's October 4, 2021 communication of its public rates can be considered an offer—as Ericsson claims—it is not FRAND, ███████████ ████████████████████████████████████████████████████████████████ ██████ .

124.    As a result of these multiple contractual breaches, Apple has been injured, including in its business and/or property.  Ericsson's refusal to offer a license to Apple on FRAND terms has deprived Apple of its right to obtain a license to Ericsson's SEPs and exposed Apple to the risk of future patent infringement claims by Ericsson.  In addition, Ericsson's refusal to offer a license on FRAND terms and conditions has consumed the time of Apple employees who have negotiated with Ericsson.  Apple also has been forced to defend groundless litigations and has incurred substantial expense in doing so.

## COUNT III

## (Breach of Duty of Good Faith)

125.    Apple restates and incorporates by reference each allegation set forth above.

---

[62]    *See* Amended Response to the Complaint ¶ 148*, Certain Wireless Communication Equipment*, Inv. No. 337-TA-577 (Aug. 29, 2006); *see also* Resps.' Mot. Partial. Summ. J. and Partial Termination with Respect to Samsung's Declared Essential Patents, *Certain Wireless Communication Equipment*, Inv. No. 337-TA-577 (Jan. 19, 2007) (arguing that Ericsson's right to FRAND licenses "is inconsistent with and precludes a grant of the exclusionary remedies" sought by Samsung); Response of Ericsson Inc. and Telefonaktiebolaget LM Ericsson ¶¶ 46-47, *Certain Wireless Communications Equipment and Articles Therein*, Inv. No. 337-TA-866 (March 8, 2013) ("Samsung's refusal to grant a license to Ericsson, despite its obligation to do so, precludes issuance of an exclusion order or any other remedy in this Investigation.").

126.    As set forth above, by committing to license its declared SEPs to users of ETSI's cellular standards on FRAND terms, Ericsson entered into contractual commitments with ETSI and its members, including Apple.

127.    Every party producing products that support ETSI cellular standards, including Apple, is an intended third-party beneficiary of Ericsson's contractual commitments to ETSI—specifically Ericsson's commitment to grant licenses on FRAND terms to all that make, use, or sell products supporting the ETSI cellular standards.

128.    Ericsson's FRAND commitments to ETSI are governed by French law. Under French law, a party to a contract has an obligation to perform its contractual obligations in good faith.  The duty of good faith requires Ericsson to negotiate with Apple for a license to Ericsson's SEPs in good faith.

129.    Ericsson has breached its obligation of good faith.  As set forth above, even before the parties engaged in commercial discussions about a renewed license, Ericsson sued Apple in this Court and in the Netherlands.  Moreover, Ericsson sued Apple during the term of the parties' current license and months before expiration, and Ericsson has since filed thirty-four more actions across six different countries, seeking injunctions and exclusion orders on Apple's products.  In addition, to the extent that Ericsson's October 4, 2021 communication of its public rate can be considered an offer—as Ericsson claims—it was not made in good faith, ████████████████ ████████████████████████████████████████████████████████████████████ ████████

130.    As a result of Ericsson's breaches of its obligation of good faith, Apple has been injured, including in its business or property.  Ericsson has wasted the time of Apple employees

who have negotiated with Ericsson.  Apple also has been forced to defend groundless litigations and has incurred substantial expense in doing so.

## COUNT IV

### (Declaration of FRAND Terms for Ericsson's Global Cellular SEP Portfolio)

131.    Apple restates and incorporates by reference each allegation set forth above.

132.    As set forth above, by committing to license its declared SEPs to users of ETSI's cellular standards on FRAND terms, Ericsson entered into contractual commitments with ETSI and its members, including Apple.

133.    Every party producing products that support ETSI cellular standards, including Apple, is an intended third-party beneficiary of Ericsson's voluntary contractual commitments to ETSI—specifically Ericsson's commitment to grant licenses on FRAND terms to all that make, use, or sell products supporting the ETSI cellular standards.

134.    As set forth above, Ericsson has chosen to engage in litigation rather than good faith negotiation to reach agreement on FRAND terms and conditions for Apple to license its cellular SEPs.

135.    In addition, Ericsson's public licensing rates are not FRAND, including ███████

████████████████████████████████████████████████████████████████████

████████████

136.    Ericsson has thus failed to provide Apple with FRAND terms and conditions for a license to its cellular SEPs.

137.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment and Ericsson has consented to this Court setting such terms.

138.    Apple is entitled to a judicial declaration that sets FRAND terms and conditions for a global license to Ericsson's cellular SEPs, including by reference to the terms previously agreed upon by the parties in their 2015 License.   Such a declaration could be made by the Court determining the amount of royalties to enter in the blanks in the proposed agreement for extension of the 2015 License enclosed in Apple's March 25, 2022 letter to Ericsson.

## PRAYER FOR RELIEF

139.    Apple requests that the Court grant the following relief:

a.    Enter judgment in favor of Apple;

b.    On Apple's Count I, adjudge and decree that Ericsson is liable for breach of the parties' 2015 License agreement;

c.    On Apple's Count II, adjudge and decree that Ericsson is liable for breach of its FRAND commitments because Ericsson has not offered royalties to Apple under FRAND rates, and enjoin Ericsson from further demanding excessive royalties from Apple that are not consistent with Ericsson's FRAND obligations;

d.    On Apple's Count III, adjudge and decree that Ericsson is liable for breach of its duty of good faith in negotiations with Apple for its FRAND-committed patents because Ericsson has not offered royalties to Apple under FRAND rates, and enjoin Ericsson from further demanding excessive royalties from Apple that are not consistent with Ericsson's FRAND obligations;

e.    On Apple's Count IV, declare that Apple is entitled to license from Ericsson any and all patents that Ericsson deems "essential" and/or has declared

"essential" to the cellular standards ETSI has promulgated under FRAND rates and set FRAND terms and conditions for a license for Apple to Ericsson's global portfolio of cellular SEPs, including by reference to the terms previously agreed upon by the parties in their 2015 License. Specifically, Apple requests that the Court determine the annual and cumulative amounts of royalties to be paid by Apple to Ericsson to complete the proposed extension of the 2015 License proposed by Apple on November 19, 2021 and then again on March 25, 2022;

f.      Enjoin and order Ericsson to grant Apple a license to any and all patents that Ericsson deems "essential" and/or has declared "essential" to the cellular standards ETSI has promulgated under the Court's determined FRAND rate, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

g.      Enter judgment against Ericsson for the amount of damages Apple proves at trial;

h.      Award to Apple its costs and expenses associated with this case, together with interest; and

i.      Grant such other and further relief as the Court may deem just and proper under the circumstances.

44

**<u>APPLE'S ANSWER AND AFFIRMATIVE DEFENSES</u>**

Except as expressly admitted below, Apple denies each and every allegation set forth in the FAC.  Apple responds to the numbered paragraphs in the FAC and the prayer for relief as follows:

**<u>NATURE OF ACTION</u>**[63]

1.  Paragraph 1 is an introductory paragraph that requires no response.  To the extent a response is required, Apple admits that Ericsson filed a FAC against Apple seeking relief and that the FAC speaks for itself.  Apple denies the remaining allegations set forth in Paragraph 1.

2.  Apple admits that Ericsson and Apple began high-level discussions regarding a schedule for negotiating renewal of their 2015 License agreement starting in late 2020.  Apple further admits that it has accused Ericsson of violating FRAND.  Apple denies the remaining allegations set forth in Paragraph 2.

3.  Apple lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 3, and on that basis, denies them.

4.  Apple lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 4, and on that basis, denies them.

5.  Apple admits that Ericsson is one of many companies that have participated in developing cellular communication standards and is one of many companies holding patents claimed to be essential to such standards.  Apple lacks sufficient knowledge or information to form

---

[63]   Apple's inclusion of the headings from the FAC is for purposes of convenience only and should not be construed as an admission or concession regarding the accuracy, implications, or relevance of those headings.

a belief as to the truth of the remaining allegations set forth in Paragraph 5 and, on that basis, denies them.

6.      Apple admits that Ericsson has voluntarily, irrevocably, and publicly committed to license on FRAND terms patents purportedly essential to certain cellular standards, that Ericsson made these commitments by submitting undertakings in the form of one or more declarations to ETSI, and that these commitments bind Ericsson to offer FRAND licensing terms and conditions to any party desiring them.  Apple denies any remaining allegations set forth in Paragraph 6.

7.      Apple lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 7, and on that basis, denies them.

8.      Apple admits that it is the largest smartphone supplier in the United States.  Apple further admits that Ericsson and Apple previously entered into global cross-license agreements in 2008 and 2015 covering certain patents owned by both parties.  In particular, under the 2015 cross-license, each party granted the other rights to patents related to the 2G, 3G, and 4G standards, and

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████    Apple denies any remaining allegations set forth in Paragraph 8.

9.      Denied.

10.     Denied.

11.     Apple admits that as part of its commitment to transparency, it has publicly stated its commitment to core FRAND principles, first more than a decade ago in front of ETSI and more recently on its website at https://www.apple.com/legal/intellectual-property/frand/.  This statement

speaks for itself, and Apple denies any allegations in Paragraph 11 that purport to include language not contained therein.  Apple denies any remaining allegations set forth in Paragraph 11.

12.     Denied.

13.     Apple admits that in this litigation, it has asserted that Ericsson's conduct has violated its FRAND commitments.  Apple denies any remaining allegations set forth in Paragraph 13.

14.     Apple states that any statements by Ericsson speak for themselves.  Apple denies the remaining allegations set forth in Paragraph 14.

15.     Admitted.

16.     Denied.

17.     Denied.

18.     Apple admits that in this litigation it has asserted the Ericsson's conduct and purported offer to Apple violate FRAND.  Paragraph 18 otherwise contains legal conclusions that do not require a response.  To the extent that a response is required, Apple denies the remaining allegations set forth in Paragraph 18.

19.     Apple admits that it has declared to ETSI that it owns certain essential patents and that it is prepared to grant licenses to such patents on FRAND terms and conditions.  Paragraph 19 otherwise contains legal conclusions that do not require a response.  To the extent a response is required, Apple denies the remaining allegations set forth in Paragraph 19.

20.     Denied.

21.     Denied.

## PARTIES

22.     On information and belief, Ericsson Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 6300 Legacy Drive, Plano, Texas 75024.  Apple lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 22 and, on that basis, denies them.

23.     On information and belief, Telefonaktiebolaget LM Ericsson is a corporation organized and existing under the laws of the Kingdom of Sweden, having its principal place of business at Torshamnsgatan 21, Kista, SE-164 83 Stockholm, Sweden.

24.     Admitted.

## JURISDICTION AND VENUE

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Paragraph 28 of the Complaint contains conclusions of law and assertions to which no response is required.

29.     Paragraph 29 of the Complaint contains conclusions of law to which no response is required.  To the extent a response is required, Apple admits that it has marketed and sold products and services in Texas.  For the purposes of this litigation only, Apple does not assert lack of personal jurisdiction as a defense in this action.  Apple lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 29 and, on that basis, denies them.

## FACTUAL BACKGROUND

A.     **Ericsson's Investment in Cellular Telecommunications and Resulting Patents**

30.     Apple lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 30, and on that basis, denies them.

31.     Apple lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 31, and on that basis, denies them.

32.     Apple lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 32, and on that basis, denies them.

33.     Apple lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 33, and on that basis, denies them.

34.     Apple lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 34, and on that basis, denies them.

35.     Apple admits that Ericsson has voluntarily, irrevocably, and publicly committed to license on FRAND terms patents purportedly essential to certain cellular standards, that Ericsson made these commitments by submitting undertakings in the form of one or more declarations to ETSI, and that these commitments bind Ericsson to offer FRAND licensing terms and conditions to any party desiring them.  Apple lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 35, and on that basis, denies them.

B.     **ETSI, its IPR Policy, and the FRAND Commitment**

36.     Admitted.

37.     Admitted.

38.     Apple admits that 3GPP working group meetings are attended by hundreds of engineers from dozens of companies involved in the cellular industry.  Apple admits that Ericsson,

49

like Apple, is one of many companies that have participated in developing cellular communications standards.  Apple lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 38, and on that basis, denies them.

39.     Apple admits that Ericsson is an ETSI member, and that Ericsson owns certain patents that it has declared essential to certain technical specifications promulgated by 3GPP.  The remaining allegations set forth in this paragraph state a legal conclusion for which no response is required.

40.     Paragraph 40 contains conclusions of law to which no response is required.  To the extent a response is required, Apple admits that ETSI has promulgated IPR policies, including 3.1, which states "the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of owners of the IPRs."  This statement speaks for itself.

41.     Apple admits that the Sections 4.1 and 15.6 of the ETSI IPR Policy contain the excerpted language, which speaks for itself.  Apple denies the allegations in Paragraph 41 to the extent they purport to attribute anything to the ETSI IPR Policy not stated therein.

42.     Denied.

43.     Apple states that its FRAND licensing policy speaks for itself and denies the allegations in Paragraph 43 to the extent that they purport to attribute anything to Apple's FRAND licensing policy that is not stated therein.  Apple admits that it has contended that where a patent owner makes a technical proposal and fails to disclose an IPR that is or may potentially be essential if that proposal is adopted, the patent owners SEP can be held unenforceable under the equitable doctrine of waiver.  Apple denies that Ericsson has complied with the ETSI IPR Policy or that it has timely disclosed its essential patents in accordance with Clause 4.1.

44.     Apple admits that the ETSI IPR Policy contains the excerpted language, which speaks for itself.  Apple denies the allegations set forth in Paragraph 44 to the extent they purport to attribute anything to the ETSI IPR Policy not stated therein.  Apple admits that Ericsson has voluntarily, irrevocably, and publicly committed to license on FRAND terms patents purportedly essential to certain cellular standards, that Ericsson made these commitments by submitting undertakings in the form of one or more declarations to ETSI, and that these commitments bind Ericsson to offer FRAND licensing terms and conditions to any party desiring them.  Apple denies any remaining allegations set forth in Paragraph 44.

45.     Apple lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 45 and, on that basis, denies them.

46.     Apple admits that it owns essential patents that cover certain cellular standards, and that it has contractually committed to ETSI that it is prepared to grant licenses to any such patents on FRAND terms and conditions.  The remaining allegations set forth in Paragraph 46 state a legal conclusion and as such require no response.  To the extent any response is required, Apple admits that companies using the relevant standards are third-party beneficiaries of FRAND commitments and can enforce those commitments.

**C.     Ericsson and Apple's Prior Licenses**

47.     Apple admits that it designs and markets a portfolio of mobile devices in the United States and this District that support certain cellular standards.  Apple also admits that it owns essential patents covering certain cellular standards.  Apple denies the remaining allegations set forth in Paragraph 47.

48.     Apple admits that Ericsson and Apple entered into global cross-license agreements covering certain patents belonging to both parties in 2008 and in 2015, and that the agreements

51

contain confidentiality clauses that prevent public disclosure of certain terms and conditions. Apple lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 48 and, on that basis, denies them.

### D.    Apple's Public Accusations That Ericsson's Licensing Program Violates FRAND

49.    Denied.

50.    Denied.

51.    Denied.

52.    Apple admits that as part of its commitment to transparency, since at least 2019 it has spelled out its FRAND principles clearly on its website, http://www.apple.com/legal/intellectual-property/frand/.  This statement speaks for itself.  Apple denies the remaining allegation set forth in Paragraph 52.

53.    Apple admits that Ericsson owns certain cellular patents that it purports are essential to cellular standards.  Apple further admits that as part of its commitment to transparency, since at least 2019 it has spelled out its FRAND principles clearly on its website, http://www.apple.com/legal/intellectual-property/frand/.  That statement speaks for itself.  Apple denies the remaining allegation set forth in Paragraph 53.

54.    Apple admits that as part of its commitment to transparency, since at least 2019 it has spelled out its FRAND principles clearly on its website, http://www.apple.com/legal/intellectual-property/frand/.  This statement speaks for itself.  Apple further states that this Court's decision in *HTC Corp. v. Telefonakitebolaget LM Ericsson*, Case 6:18-cv-00243 (Dkt. 583), *affirmed* 2021 WL 3877749, 12 F.4th 476 (5th. Cir. 2021), speaks for itself.  Apple denies the remaining allegations set forth in Paragraph 54.

55.     Apple admits that as part of its commitment to transparency, it has since at least 2019 spelled out its FRAND principles clearly on its website, http://www.apple.com/legal/intellectual-property/frand/.  This statement speaks for itself.  Apple states that the Fifth Circuit's decision in *HTC Corp. v. Telefonakitebolaget LM Ericsson*, 2021 WL 3877749, 12 F.4th 476 (5th. Cir. 2021), speaks for itself.  Apple denies the remaining allegations set forth in Paragraph 55.

56.     Apple admits that as part of its commitment to transparency, it has since at least 2019 spelled out its FRAND principles clearly on its website, http://www.apple.com/legal/intellectual-property/frand/.  That statement speaks for itself.  Apple denies the remaining allegations set forth in Paragraph 56.

### E.      The Parties' Negotiations

57.     Apple admits that Ericsson and Apple began high-level discussions regarding a schedule for negotiating renewal of their license agreement starting in late 2020.  Apple states that Ericsson delayed the commencement of the technical discussions that were to precede the parties' commercial discussions until the end of August 2021, despite Apple's offer in June to start those discussions earlier.  Apple admits that licensing negotiations involve both technical and business discussions.  Apple denies the remaining allegations set forth in Paragraph 57.

58.     Apple admits that certain aspects of the parties' discussions were conducted under a non-disclosure agreement.  Apple states that its public FRAND positions speak for themselves and denies any allegations set forth in Paragraph 58 that purport to attribute anything to Apple's positions not stated there.  Apple denies the remaining allegations set forth in Paragraph 58.

59.     Apple admits that, in connection with the parties' discussions, they exchanged three rounds of claim charts for both parties' declared-essential cellular patents.  Apple admits that the

parties met multiple times to discuss these claim charts.  Apple admits that Apple and Ericsson discussed their reactions to those claim charts.  Apple denies any remaining allegations set forth in Paragraph 59.

60.    Denied.

61.    Apple admits that it believes Ericsson's offer and licensing practices violate FRAND.  Apple denies the remaining allegations set forth in Paragraph 61.

62.    Apple states that the prior litigation history between the parties is a matter of public record and speaks for itself.  Apple denies that this history has any bearing on the cross-licensing discussions that began in 2021.  Apple denies the remaining allegations set forth in Paragraph 62.

63.    Denied.

## COUNT I

## DECLARATORY JUDGMENT THAT ERICSSON HAS COMPLIED WITH ITS FRAND COMMITMENT AND THE ETSI IPR POLICY

64.    Apple incorporates by reference the answers to the preceding paragraphs as though fully set forth herein.

65.    Apple admits that it designs and markets products that support certain cellular standards.  Apple admits that these products are manufactured on behalf of Apple.  Apple denies the remaining allegations set forth in Paragraph 65.

66.    Apple admits that Ericsson has voluntarily, irrevocably, and publicly committed to license on FRAND terms patents purportedly essential to certain cellular standards, that Ericsson made these commitments by submitting undertakings in the form of one or more declarations to ETSI, and that these commitments bind Ericsson to offer FRAND licensing terms and conditions

to any party desiring them.  Apple lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 66 and, on that basis, denies them.

67.     Admitted.

68.     Admitted.

69.     Apple admits that Ericsson has publicly announced its 5G multimode royalty rates, but denies that those rates are FRAND.

70.     Apple admits that it has asserted that Ericsson's conduct in the course of the parties' negotiations violates Ericsson's FRAND commitment.  The remaining allegations contain a legal conclusion that does not require a response.  To the extent a response is required, Apple denies the remaining allegations set forth in Paragraph 70.

71.     Admitted.

72.     Apple denies that Ericsson has negotiated with Apple in good faith.  The remaining allegations set forth in this paragraph contain legal conclusions that do not require a response.  To the extent a response is required, Apple denies the remaining allegations set forth in Paragraph 72.

73.     This paragraph states Ericsson's requested relief and therefore no response is required.  To the extent this paragraph contains any factual allegations, Apple denies them. Apple denies that Ericsson is entitled to any relief whatsoever, including without limitation the relief request in Paragraph 73.

## COUNT II

## BREACH OF CONTRACT

74.     Apple incorporates by reference the answers to the preceding paragraphs as though fully set forth herein.

75.     Apple admits that it owns certain patents that have been declared essential to ETSI.

76.     Apple admits that Ericsson is one of many companies that own patents purportedly essential to cellular standards.  Apple lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 76.

77.     Admitted.

78.     Apple admits that Ericsson has voluntarily, irrevocably, and publicly committed to license on FRAND terms patents purportedly essential to certain cellular standards, that Ericsson made these commitments by submitting undertakings in the form of one or more declarations to ETSI, and that these commitments bind Ericsson to offer FRAND licensing terms and conditions to any party desiring them.  Apple lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 78, and on that basis, denies them.

79.     Admitted.

80.     Apple admits that it owns certain patents essential to cellular standards and that it has contractually committed to ETSI to be prepared to grant licenses to such patents on FRAND terms and conditions.  Apple denies the remaining allegations set forth in Paragraph 80.

81.     Apple admits that Ericsson and Apple began high-level discussions regarding a schedule for negotiating renewal of their license agreement starting in late 2020.  Apple states that it has offered Ericsson numerous paths to a FRAND royalty rate for its patent portfolio.  These paths have included Apple's substantial FRAND license offer; Apple's offer to engage in binding arbitration, and Apple's suit in the Eastern District of Texas, asking the Court to set binding FRAND terms for a global license to Ericsson's SEPs (and its willingness to have terms for Apple's own SEPs included in a cross license).  Ericsson has not accepted any of these paths Apple has offered.  Apple denies the remaining allegations set forth in Paragraph 81.

82.     Denied.

56

83.     Apple admits that it has rejected Ericsson's current offers for a cross-license because they violate FRAND.  Apple denies the remaining allegations set forth in Paragraph 83.

84.     Denied.

85.     Denied.

86.     Denied.

87.     Denied.

## COUNT III

## BREACH OF OBLIGATION TO NEGOTIATE IN GOOD FAITH

88.     Apple incorporates by reference the answers to the preceding paragraphs as though fully set forth herein.

89.     Apple admits that French law governs a party's ETSI FRAND commitment and that under French law, Apple is required to negotiate in good faith, which it did.  The remaining allegations set forth in Paragraph 89 contain legal conclusions that do not require a response.  To the extent a response is required, Apple denies the remaining allegations set forth in Paragraph 89.

90.     Denied.

91.     Denied.

92.     Denied.

93.     Denied.

## PRAYER FOR RELIEF

Apple denies that Ericsson is entitled to any of the relief requests in its Prayer for Relief. To the extent the Prayer for Relief is interpreted to contain any factual allegations, Apple denies them.

## DEFENSES

Apple alleges and asserts the following defenses in response to the allegations in Ericsson's FAC and each claim for relief therein.  Apple undertakes the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein.  Apple specifically reserves all rights to allege additional defenses that become known through the course of discovery.

### FIRST DEFENSE
### (Failure to State a Claim)

Ericsson fails to state a claim upon which relief can be granted because Ericsson has not alleged facts sufficient to prove one or more of the necessary elements of its causes of action.

### SECOND DEFENSE
### (Failure to Mitigate)

Ericsson's claims are barred by its failure to mitigate damages because it sued Apple before the parties had even met to discuss business terms and has refused Apple's good faith offer, Apple's good faith efforts to negotiate a license, and Apple's offer to arbitrate.

### THIRD DEFENSE
### (Failure to Negotiate in Good Faith)

Ericsson has failed to negotiate with Apple in good faith toward a license to the parties' respective portfolios of declared-essential patents.

### FOURTH DEFENSE
### (Breach of FRAND)

Ericsson has failed to negotiate with Apple over the terms of a license in good faith and/or has failed to satisfy its obligations under FRAND.

## <u>RESERVATION OF ADDITIONAL DEFENSES</u>

Apple reserves any and all additional defenses available under Section 35 of the United States Code, the rules, regulations, or laws related thereto, the Federal Rules of Civil Procedure, the Rules of this Court, and/or otherwise in law or equity, now existing, or later arising, as may be discovered.  Apple reserves all rights to amend or supplement its Answer in accordance with the Federal Rules of Civil Procedure.

DATED: April 6, 2022

Respectfully submitted,

 */s/ Melissa R. Smith*
Melissa R. Smith
State Bar No. 24001351
melissa@gillamsmithlaw.com
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, TX 75670
Telephone: 903-934-8450
Facsimile: 903-934-9257

Ruffin Cordell
cordell@fr.com
State Bar No. 04820550
FISH & RICHARDSON P.C.
1000 Maine Ave SW, Suite 1000
Washington, DC 20024
Telephone: 202-783-5070
Facsimile: 202-783-2331

Benjamin C. Elacqua
State Bar No. 24055443
elacqua@fr.com
FISH & RICHARDSON P.C.
1221 McKinney Street, Suite 2800
Houston, TX 77010
Telephone: 713-654-5300
Facsimile: 713-652-0109

Betty Chen
State Bar No. 24056720
bchen@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: 650-839-5070
Facsimile: 650-839-5071

Joseph J. Mueller (*pro hac vice*)
Timothy D. Syrett (*pro hac vice*)
joseph.mueller@wilmerhale.com
timothy.syrett@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: 617-526-6000
Facsimile: 617-526-5000

Mark D. Selwyn (*pro hac vice*)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real #400
Palo Alto, CA 94306
Telephone: 650-858-6000
Facsimile: 650-858-6100

**Attorneys for Defendant Apple Inc.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  Plaintiffs' counsel of record were served with a true and correct copy of the foregoing document by electronic mail on April 6, 2022.


*/s/ Melissa R. Smith*
Melissa R. Smith

